# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 10, 2016 Session[1]

## STATE OF TENNESSEE v. KENNETH MCCORMICK

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for White County**
**No. CR5719    David A. Patterson, Judge**

_____

**No. M2013-02189-SC-R11-CD – Filed May 10, 2016**
_____

We granted this appeal to reconsider our decision in State v. Moats, 403 S.W.3d 170 (Tenn. 2013), which held that the community caretaking doctrine is not an exception to the federal and state constitutional warrant requirements. Having concluded that Moats was wrongly decided, we overrule Moats and hold that the community caretaking doctrine is analytically distinct from consensual police-citizen encounters and is instead an exception to the state and federal constitutional warrant requirements which may be invoked to validate as reasonable a warrantless seizure of an automobile. To establish that the community caretaking exception applies, the State must show that (1) the officer possessed specific and articulable facts, which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need. We conclude, based on the proof in the record on appeal, that the community caretaking exception applies in this case. Accordingly, the judgments of the trial court and Court of Criminal Appeals declining to grant the defendant's motion to suppress are affirmed on the separate grounds stated herein.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed on Separate Grounds

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and JEFFREY S. BIVINS and HOLLY KIRBY, JJ., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Kenneth McCormick.

---

[1] We heard oral arguments in this appeal at the Nashville School of Law.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Leslie E. Price, Senior Counsel; Michelle L. Consiglio-Young, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; Philip Hatch, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

On August 27, 2012, Kenneth McCormick, the defendant, was indicted by the White County Grand Jury for first offense driving under the influence of an intoxicant ("DUI"). On December 13, 2012, the defendant filed a motion to suppress the evidence against him, arguing, as pertinent to this appeal, that the warrantless seizure of his parked vehicle and the ensuing field sobriety tests were not supported by reasonable suspicion. After a pretrial hearing on February 14, 2013, the trial court denied the defendant's suppression motion by an order entered on April 23, 2013. The defendant filed a motion for reconsideration, and the trial court allowed the defendant a jury-out hearing on his reconsideration motion during the defendant's trial, which occurred on May 10, 2013. The proof offered at both suppression hearings and at trial is summarized below.

At approximately 2:45 a.m. on April 8, 2012, Sergeant Daniel Trivette ("Sgt. Trivette") of the White County Sheriff's Department was on routine patrol on Highway 111 when he saw a tan Chevrolet Tahoe that, "from where [he] was traveling, appeared to be sitting in the roadway in front of the Save-A-Lot Food Store on Knowles Drive." Sgt. Trivette "pulled onto Knowles Drive, pulled behind the vehicle, [and] realized it was actually sitting in the entrance to the parking lot" of the Save-A-Lot, blocking about 75% of the entrance. The shopping center was closed. The back left wheel and rear portion of the parked vehicle were "partially in the roadway," while the "other three wheels w[ere] at an angle." Sgt. Trivette parked his patrol car "in the roadway" behind the vehicle and activated the patrol car's "back blue lights" for "safety" reasons, specifically to prevent his vehicle or the parked vehicle from being rear ended during the stop.

Sgt. Trivette then exited his patrol car "to do a welfare check on the subject in the vehicle." The headlights of the vehicle were on and its engine was running. Sgt. Trivette walked up to the driver's side door of the vehicle and observed a man, later identified as the defendant, "slumped over the wheel." Sgt. Trivette attempted to rouse the defendant by "tapping on the window," but "loud music" was blaring from inside the vehicle. The defendant did not respond. Sgt. Trivette then opened the door and "detected a strong odor of alcoholic beverage on [the defendant's] breath and person." Sgt. Trivette noticed "McDonald's food in [the defendant's] lap," "an open beer bottle" in the center console, and "some sort of sauce all over [the defendant's] face," as if "he had been eating." Sgt. Trivette tried to wake the defendant for about a minute before the defendant finally

responded. After making sure the defendant was "okay," Sgt. Trivette turned down the radio, turned off the engine, and asked the defendant to exit the vehicle. The defendant complied, and Sgt. Trivette removed the keys from the ignition and placed them in the driver's seat.

By the time the defendant exited the vehicle, a White County Sheriff's deputy, Scott O'Dell ("Deputy O'Dell"), had arrived at the scene in response to Sgt. Trivette's call for assistance with a welfare check. Both officers described the defendant upon exiting his vehicle as "very unsteady on his feet," "swaying," "stumbling," and having "difficulty standing still." The defendant stated that he had consumed three to four beers. When Sgt. Trivette asked the defendant if he thought he should be driving, the defendant responded, "Not necessarily." Sgt. Trivette then administered four field sobriety tests, and Sgt. Trivette and Deputy O'Dell testified about the defendant's performance on these tests.[2] Additionally, a video recording of the defendant performing the tests was admitted into evidence.

After the defendant failed three of the four field sobriety tests,[3] Sgt. Trivette asked the defendant how much alcohol he had consumed and when he had begun drinking that evening. The defendant replied that he had begun drinking at approximately 7:00 p.m. and had consumed five or six beers. When Sgt. Trivette asked the defendant for the current time, the defendant responded 11:30 p.m., when, according to Sgt. Trivette, it was actually 3:00 a.m. Sgt. Trivette then arrested the defendant for DUI.

After Sgt. Trivette advised the defendant of the implied consent law, the defendant refused a blood test. While the defendant was in the back seat of the police car, another vehicle attempted to enter the shopping center parking lot through the entrance the defendant's vehicle was obstructing. When Sgt. Trivette asked the defendant if he knew the person driving the vehicle, the defendant responded, "No, I sure don't. I'm sorry. I've had too much to drink." During the ensuing inventory search of the defendant's vehicle, Sgt. Trivette found four unopened, cold beers in the back seat and a bottle containing the defendant's prescription Xanax.

Testifying at trial for the defense, Lance Wyatt explained that he and the defendant had spent the evening preceding the arrest at a golf club lounge. The defendant had agreed to serve as the designated driver for the evening. Mr. Wyatt had observed the defendant have one or possibly two drinks at the golf club lounge that evening, but at trial Mr. Wyatt maintained that the defendant had not been intoxicated when they left the

---

[2] Specifically, Sgt. Trivette administered the horizontal gaze nystagmus test, the walk and turn test, the one-leg stand test, and the Romberg test. The defendant did not object to the officer's testimony about his performance on these tests and has not raised any complaint about the admission of this testimony as an issue on appeal.

[3] The defendant failed the walk and turn test, the one leg-stand test, and the Romberg test.

lounge to drive to Mr. Wyatt home's between 12:15 and 12:30 a.m. Mr. Wyatt acknowledged, however, that his own judgment had been impaired from drinking that evening. Mr. Wyatt denied seeing beer in the console of the defendant's car when he exited the vehicle, but he conceded not knowing what or how much the defendant drank after he left the defendant's vehicle around midnight.

The trial court refused to grant the defendant's motion for reconsideration of his motion to suppress, explaining that if the seizure of the defendant in his parked vehicle was not supported by reasonable suspicion, it was nevertheless valid as an exercise of Sgt. Trivette's community caretaking function. In so ruling, the trial court emphasized Sgt. Trivette's consistent testimony at the initial suppression hearing and at the reconsideration hearing that he had approached the defendant's vehicle to conduct a welfare check and had turned on his rear blue lights for safety reasons.

The trial court submitted the criminal charge to the jury, which convicted the defendant of first offense DUI. See Tenn. Code Ann. § 55-10-401 (2012).[4] The trial court imposed an eleven month, twenty-nine day sentence and ordered the defendant to serve ten days, with the remainder to be served on probation. In his motion for new trial, the defendant raised a single issue, arguing that Sgt. Trivette's actions in pulling behind him in his parked vehicle and activating the patrol car's rear blue lights amounted to a seizure that was not supported by reasonable suspicion. The trial court denied the motion for new trial, and the defendant appealed, raising the same single issue he had raised in his motion for new trial. State v. McCormick, No. M2013-02189-CCA-R3-CD, 2015 WL 1543325, at *1-2 (Tenn. Crim. App. Apr. 2, 2015), appeal granted (Tenn. Sept. 25, 2015). The Court of Criminal Appeals affirmed the trial court's judgment, concluding that Sgt. Trivette's activation of his patrol car's rear blue lights was an exercise of the community caretaking function and not a seizure. Id. at *5.

---

[4] This statute provides:

It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises that is generally frequented by the public at large, while:

(1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself which the driver would otherwise possess; or

(2) The alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08 %) or more.

In this Court, the defendant filed a Tennessee Rule of Appellate Procedure 11 application for permission to appeal arguing that the courts below erred by denying his motion to suppress. We granted the application, and in addition to the issue the defendant raised, directed the parties to brief and argue the question of "whether th[is] Court should revisit its holding in State v. Moats, 403 S.W.3d 170 (Tenn. 2013), and prior Tennessee decisions that limited the community caretaking doctrine to third-tier consensual police-citizen encounters." State v. McCormick, No. M2013-02189-SC-R11-CD (Tenn. Sept. 25, 2015) (order granting application and directing supplemental briefing).

## II. Standard of Review

The standards governing appellate review of trial court decisions on motions to suppress are well established. A trial court's findings of fact after a suppression hearing are conclusive on appeal unless the evidence in the record preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). As a general rule, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. A trial court's application of law to facts is reviewed de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

## III. Analysis

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no [w]arrants shall issue, but upon probable cause."[5] Likewise, article I, section 7 of the Tennessee Constitution ensures that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures," and that "general warrants" lacking particularity and evidentiary support "ought not to be granted." Neither the text of the Fourth Amendment nor that of article 1, section 7 specifies when a search warrant must be obtained, but the United States Supreme Court "has inferred that a warrant must generally be secured." Kentucky v. King, 563 U.S. 452, 459 (2011). The same general rule applies to article I, section 7. See State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) ("[T]he Constitution of the United States and the Constitution of Tennessee prohibit unreasonable searches and seizures. Thus, as a general matter, law enforcement officials cannot conduct a search without having first obtained a valid warrant." (internal citations omitted)). While searches and seizures conducted pursuant to warrants are presumptively reasonable, State v. Scarborough, 201 S.W.3d 607, 616-17 (Tenn. 2006), warrantless

---

[5] The Fourth Amendment applies to the States through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

searches and seizures are presumptively unreasonable. King, 563 U.S. at 459; State v. Bell, 429 S.W.3d 524, 529 (Tenn. 2014). Nevertheless, "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)); see also Meeks, 262 S.W.3d at 722. Accordingly, courts have recognized certain reasonable exceptions to the warrant requirement and have held that a warrantless search or seizure is reasonable if it falls within one of these exceptions. Meeks, 262 S.W.3d at 722 (listing some of the "commonly recognized exceptions to the requirement of a warrant").

Of course, the warrant requirements of the federal and state constitutions are implicated only when a search or seizure actually occurs, and not every police-citizen interaction results in a search or seizure. See State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008); State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). This appeal involves an alleged seizure. Regarding seizures, Tennessee courts have generally recognized three levels of police-citizen interactions: (1) the full-scale arrest, which must be supported by probable cause; (2) the brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) the brief, consensual police-citizen encounter, which does not amount to a seizure and need not be supported by any level of individualized suspicion or objective justification. Day, 263 S.W.3d at 901. "Of the three categories, only the first two rise to the level of a 'seizure' for constitutional analysis purposes." Id.

The first relevant question for purposes of this appeal then is whether Sgt. Trivette's actions in parking behind the defendant's vehicle and activating his patrol car's rear blue lights amounted to a warrantless seizure or was merely a consensual interaction between the defendant and the officer. If the latter, then the state and federal constitutional protections against unreasonable searches and seizures are not implicated. Id. However, if Sgt. Trivette's actions amounted to a seizure, then the warrantless seizure is presumed unreasonable, but the presumption may be overcome, and suppression of evidence avoided, if the State demonstrates that the seizure was conducted pursuant to one of the exceptions to the warrant requirement. King, 563 U.S. at 460; Day, 263 S.W.3d at 901 n.9; State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006); Yeargan, 958 S.W.2d at 629.

## A. Seizure

In this appeal, the defendant argues that Sgt. Trivette's actions amounted to a warrantless seizure and that the seizure was not based upon reasonable suspicion or any other exception to the warrant requirement. Yeargan, 958 S.W.2d at 629. Therefore, the defendant argues that the courts below erred by denying his motion to suppress.

The State responds to the defendant's arguments in two ways. First, the State argues that Sgt. Trivette's activation of the rear facing blue lights on his patrol car did not amount to a seizure because the defendant was unconscious and was, therefore, unable to yield to any show of authority by Sgt. Trivette.[6] This aspect of the State's argument is premised on California v. Hodari D., 499 U.S. 621, 626 (1991), in which the Supreme Court held that a seizure occurs for purposes of the Fourth Amendment only when an officer uses physical force to detain a person or where a person submits or yields to a show of authority by the officer. In so holding, the Supreme Court limited United States v. Mendenhall, 446 U.S. 544, 554 (1980), which had held that a seizure occurs when a reasonable person, under the totality of the circumstances, would not feel free to leave. The State acknowledges that this Court implicitly rejected the Hodari D. standard when it reaffirmed the Mendenhall standard in State v. Randolph, 74 S.W.3d 330, 337 (Tenn. 2002). Nevertheless, the State contends that, because the protections afforded by article I, section 7 are coextensive with those provided by the Fourth Amendment, this Court should revisit the issue and adopt the Hodari D. definition of seizure. The State also relies upon a portion of the analysis in Moats, 403 S.W.3d at 187, which purported to distinguish between an officer's activation of blue lights to effectuate a seizure and an officer's activation of blue lights to perform a community caretaking function.

Alternatively, the State argues that if Sgt. Trivette's actions amounted to a seizure, this Court should overrule Moats, hold that the community caretaking doctrine is an exception to the warrant requirement under the federal and state constitutions, and conclude that the seizure in this case was appropriate under the community caretaking exception. We agree with the State that Moats should be reconsidered and overruled. Therefore, for purposes of this appeal, we will presume that Sgt. Trivette's actions in parking behind the defendant's vehicle and activating his rear facing blue lights constituted a seizure. As a result, we need not reach the issue in this case of whether we should revisit the Hodari D. standard for determining if a seizure has occurred. We turn our attention next to analyzing and reconsidering the community caretaking doctrine and Moats.

---

[6] During oral argument, the State asserted that even if a seizure occurred, it was justified based upon reasonable suspicion. This assertion is not listed as a separate issue in the State's brief in this Court, nor did the State raise this argument in the courts below. It is well settled that issues not listed in the appropriate section of an appellate brief and arguments raised for the first time on appeal may be deemed waived. Hodge v. Craig, 382 S.W.3d 325, 334-35 (Tenn. 2012). We decline to address this argument.

### B. Community Caretaking Doctrine

The community caretaking doctrine originated in the United States Supreme Court's decision in Cady v. Dombrowski, 413 U.S. 433 (1973). In Cady, Chicago police officer Chester Dombrowski, while on a visit to Wisconsin, reported to local authorities that he had been involved in an automobile accident. Under the mistaken impression that Chicago police officers were required to carry their service revolvers at all times and having found no revolver on Dombrowski's person, one of the responding officers looked for the weapon in the front seat and glove compartment of his disabled vehicle but found nothing. Id. The vehicle was then towed to a privately owned garage, where it was left in an unsecured area. Id. After Dombrowski was arrested for drunken driving and taken to a local hospital, one of the officers returned to the vehicle without a warrant to search again for the revolver in order "to protect the public from the possibility that [it] would fall into untrained or perhaps malicious hands." Id. at 443. In the trunk of the vehicle, the officer found and seized numerous items that linked Dombrowski to a recent homicide, id. at 437, and ultimately these items were used as evidence to obtain his conviction for first-degree murder, id. at 438-39. Dombrowski argued these items were illegally seized in violation of the Fourth Amendment and should have been excluded from evidence.

Rejecting Dombrowski's constitutional argument, the United States Supreme Court upheld the warrantless search of Dombrowski's vehicle as reasonable because it was undertaken pursuant to the officer's "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441. The Court also emphasized the lesser expectation of privacy associated with motor vehicles, explaining:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. . . .
> . . . .
> The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking "search" conducted here . . . was not unreasonable solely because a warrant had not been obtained.

Id. at 441, 447-48; see also id. at 442 ("The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal

contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband.").[7]

The United States Supreme Court has not revisited the community caretaking doctrine since its decision in Cady.[8] However, an overwhelming majority of lower federal courts and state courts have consistently described and applied the doctrine as an exception to the Fourth Amendment's warrant requirement.[9] This widespread adoption

---

[7] There is a split of authority among state and federal courts as to whether the community caretaking doctrine should extend beyond the context of automobiles to residences. Macdonald v. Town of Eastham, 946 F.Supp.2d 235, 241-42 (D. Mass. 2013) (collecting cases); Gregory T. Helding, Stop Hammering Fourth Amendment Rights: Reshaping the Community Caretaking Exception with the Physical Intrusion Standard, 97 Marq. L. Rev. 123, 140-48 (2013) (collecting and analyzing state and federal cases). We need not concern ourselves with that issue because this appeal involves only a parked vehicle.

[8] The Supreme Court has twice applied Cady to hold that reasonable warrantless inventory searches of impounded vehicles are permissible. See Colorado v. Bertine, 479 U.S. 367, 372 (1987); South Dakota v. Opperman, 428 U.S. 364, 368-69, 375-76 (1976).

[9] See United States v. Cervantes, 703 F.3d 1135, 1140 (9th Cir. 2012) (considering "whether the impoundment and subsequent inventory search of [the defendant's] vehicle were justified by the community caretaking exception to the Fourth Amendment's warrant requirement"); Ray v. Twp. of Warren, 626 F.3d 170, 174-77 (3d Cir. 2010) (describing the community caretaking doctrine as an exception to the warrant requirement but refusing to apply it to justify warrantless searches of homes); Lockhart-Bembery v. Sauro, 498 F.3d 69, 75 (1st Cir. 2007) (observing that the question is not "whether there was a seizure" because, "under the community caretaking doctrine, police action can be constitutional *notwithstanding* the fact that it constitutes a seizure"); United States v. Coccia, 446 F.3d 233, 237-38 (1st Cir. 2006) (stating that there are exceptions to the warrant requirement, "including the community caretaking exception"); United States v. Garner, 416 F.3d 1208, 1213 (10th Cir. 2005) (discussing the community caretaking exception to the warrant requirement); United States v. Johnson, 410 F.3d 137, 144-45 (4th Cir. 2005) (applying the "community caretaking exception" to uphold a warrantless search of a vehicle's glove compartment); Williams v. State, 962 A.2d 210, 216 (Del. 2008) (recognizing the "'community caretaker' or 'public safety' doctrine" as an "exception" to the warrant requirement); Hawkins v. United States, 113 A.3d 216, 221-22 (D.C. 2015) (recognizing the community caretaking exception and adopting a four-part test to determine whether the exception applies); People v. Luedemann, 857 N.E.2d 187, 198-99 (Ill. 2006) ("[T]he 'community caretaking' doctrine is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the [F]ourth [A]mendment."); State v. Crawford, 659 N.W.2d 537, 543 (Iowa 2003) ("Implicit in any community caretaking case is the fact that there has been a seizure within the meaning of the Fourth Amendment. Otherwise there would be no need to apply a community caretaking exception."); In re J.M.E., 162 P.3d 835, 839 (Kan. Ct. App. 2007) (describing the community caretaking doctrine as an "exception" to the Fourth Amendment); Poe v. Commonwealth, 169 S.W.3d 54, 56-59 (Ky. Ct. App. 2005) (recognizing the community caretaking exception); Wilson v. State, 975 A.2d 877, 891 (Md. 2009) (recognizing that the community caretaking doctrine functions as an exception and enunciating a test for its application); Commonwealth v. Fisher, 13 N.E.3d 629, 632-34 (Mass. App. Ct. 2014) (discussing the purpose, application, and importance of the community caretaking doctrine as an exception to the warrant requirement); People v. Slaughter, 803 N.W.2d 171, 180 (Mich. 2011) (describing the community caretaking doctrine as an exception to the warrant requirement); Trejo v. State, 76 So. 3d 684, 689 (Miss.

of the community caretaking doctrine as an exception to the warrant requirement reflects the reality that modern society expects police officers to fulfill various responsibilities. See Ullom v. Miller, 705 S.E.2d 111, 120 (W.Va. 2010) ("[L]aw enforcement personnel are expected to engage in activities and interact with citizens in a number of ways beyond the investigation of criminal conduct. Such activities include a general safety and welfare role for police officers in helping citizens who may be in peril or who may otherwise be in need of some form of assistance.").

> Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect

2011) (recognizing "the community caretaking exception" to the warrant requirement); State v. Graham, 175 P.3d 885, 890 (Mont. 2007) ("The community caretaker doctrine . . . is a recognized exception to the Fourth Amendment's and [the Montana Constitution's] prohibitions against unreasonable searches and seizures."); State v. Bakewell, 730 N.W.2d 335, 338 (Neb. 2007) ("[W]e hereby adopt the community caretaking exception to the Fourth Amendment."); State v. Rincon, 147 P.3d 233, 237 (Nev. 2006) (adopting the community caretaking exception to the Fourth Amendment); State v. Boutin, 13 A.3d 334, 337-38 (N.H. 2010) (discussing prior New Hampshire cases applying the community caretaking exception); State v. Edmonds, 47 A.3d 737, 752 (N.J. 2012) ("The community-caretaking doctrine is an exception to the warrant requirement . . . ."); State v. Ryon, 108 P.3d 1032, 1041 (N.M. 2005) (acknowledging that its earlier description of community caretaking as a form of consensual encounter "was wrong" and cautioning that certain prior decisions should "not be viewed as limiting the community caretaker exception to voluntary or consensual police-citizen encounters"); State v. Smathers, 753 S.E.2d 380, 384 (N.C. Ct. App. 2014) (recognizing the community caretaking doctrine as an exception to the Fourth Amendment warrant requirement); State v. Dunn, 964 N.E.2d 1037, 1042 (Ohio 2012) (recognizing "the community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement"); Coffia v. State, 191 P.3d 594, 597-98 (Okla. Crim. App. 2008) (discussing the community caretaking exception to the Fourth Amendment); State v. Wood, 149 P.3d 1265, 1267-68 (Or. Ct. App. 2006) (describing an Oregon statute as a community caretaking exception to the warrant requirement); State v. Deneui, 775 N.W.2d 221, 235 (S.D. 2009) (recognizing and applying the community caretaking exception); Wright v. State, 7 S.W.3d 148, 151-52 (Tex. Crim. App. 1999) (en banc) (describing Cady as recognizing "a community caretaking function of law enforcement as a reasonable exception to the Fourth Amendment's warrant requirement" and acknowledging "the existence of the community caretaking function in Texas"); Provo City v. Warden, 844 P.2d 360, 363-65 (Utah Ct. App. 1992) (upholding a "seizure" as reasonable under the Fourth Amendment based on the community caretaking doctrine); State v. Ford, 998 A.2d 684, 689 (Vt. 2010) (recognizing "community caretaking" as a separate "exception" to the Fourth Amendment warrant requirement); Knight v. Commonwealth, 734 S.E.2d 716, 720 (Va. Ct. App. 2012) ("Virginia recognizes a 'community caretaker' exception to the Fourth Amendment warrant requirement."); State v. Kinzy, 5 P.3d 668, 676 (Wash. 2000) (en banc) ("The community caretaking function exception recognizes that a person may encounter police officers in situations involving not only emergency aid, but also involving a routine check on health and safety."); Ullom v. Miller, 705 S.E.2d 111, 120 (W. Va. 2010) ("The 'community caretaker' doctrine is a widely recognized exception to the general warrant requirement of the Fourth Amendment of the United States Constitution."); State v. Kramer, 759 N.W.2d 598, 603-06, 608-12 (Wis. 2009) (discussing and applying the community caretaking exception).

people, not just from criminals, but also from accidents, natural perils and even self-inflicted injuries. We ask them to protect our property from all types of losses—even those occasioned by our own negligence. They counsel our youth. They quell disputes between husband and wife, parent and child, landlord and tenant, merchant and patron and quarreling neighbors. Although they search for clues to solve crime, they also search for missing children, parents, dementia patients, and occasionally even an escaped zoo animal. They are society's problem solvers when no other solution is apparent or available.

State v. Matalonis, 875 N.W.2d 567, 576-77 (Wis. 2016) (quoting Ortiz v. State, 24 So. 3d 596, 607 n.5 (Fla. Dist. Ct. App. 2009) (Torpy, J., concurring and concurring specially)).

## C.  Reconsideration of *Moats*

Despite its widespread adoption and laudatory purpose, at one time four states, Illinois, New Mexico, North Dakota, and Tennessee, "confined the community caretaking doctrine to consensual police-citizen encounters." Moats, 403 S.W.3d at 190 (Clark and Koch, JJ., dissenting) (citing People v. Luedemann, 857 N.E.2d 187, 197 n.4 (Ill. 2006)). By 2013, however, the supreme courts of Illinois and New Mexico had "explicitly abandoned" this limitation and abrogated prior decisions confining the community caretaking doctrine to consensual police-citizen interactions. Id. (citing Luedemann, 857 N.E.2d at 198-99; State v. Ryon, 108 P.3d 1032, 1041 (N.M. 2005)). However, three years ago in Moats, a three-to-two decision, this Court reaffirmed prior decisions that had limited the community caretaking doctrine to third-tier "consensual police-citizen encounters that do not require probable cause or reasonable suspicion, whereas the requisite level of probable cause or reasonable suspicion must be satisfied when a seizure has taken place." Id. at 182.

The Moats majority grounded this limitation in the Tennessee Constitution, id. at 187 n.8, even though the defendant had neither relied upon the state constitution nor argued that it provided greater protection than the Fourth Amendment, and even though this Court had "long held" that article I, section 7 "is identical in intent and purpose to the Fourth Amendment," State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006) (citing State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)); see also State v. Donaldson, 380 S.W.3d 86, 92 (Tenn. 2012) ("[I]n the context of traffic stops, the protections afforded by article I, section 7 of the Tennessee Constitution [are] coextensive with the protections afforded by the Fourth Amendment as defined in [Whren, 517 U.S. at 813]." (citing State v. Vineyard, 958 S.W.2d 730, 734, 736 (Tenn. 1997))).

Two justices, including the undersigned, filed a joint dissenting opinion in Moats, asserting that prior Tennessee decisions limiting the community caretaking doctrine to consensual police-citizen encounters had been wrongly decided and should be overruled and that the community caretaking doctrine should be recognized "as an exception to the Fourth Amendment's warrant and probable cause requirements." Moats, 403 S.W.3d at 188 (Clark and Koch, JJ., dissenting). The dissenting justices would have held:

> that a warrantless seizure of a parked car is justified under the community caretaking exception if the State establishes that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

Id. at 195 (Clark and Koch, JJ., dissenting). The dissenting justices explained that "[d]etermining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case[,]" including "the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance." Id. at 195-96 (Clark and Koch, JJ., dissenting) (citing Salinas v. State, 224 S.W.3d 752, 756 (Tex. Ct. App. 2007); State v. Pinkard, 785 N.W.2d 592, 605 (Wis. 2010)).

Having now fully reconsidered Cady, state and federal decisions applying it, and the majority and dissenting opinions in Moats, we conclude that Moats should be overruled. We recognize that "[s]tare decisis promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Pearson v. Callahan, 555 U.S. 223, 233 (2009) (quoting Payne v. Tennessee, 501 U.S. 808, 827 (1991)) (internal quotation marks omitted). Like the United States Supreme Court, "we approach the reconsideration of our decisions with the utmost caution," but we also emphasize that "stare decisis is not an inexorable command." Id. at 233 (quoting State Oil Co. v. Khan, 522 U.S. 3, 20 (1997)) (internal quotation marks and alterations omitted). Although the power to overrule former decisions "is very sparingly exercised and only when the reason is compelling," Edingbourgh v. Sears, Roebuck & Co., 337 S.W.2d 13, 14 (Tenn. 1960), "[o]ur oath is to do justice, not to perpetuate error," Jordan v. Baptist Three Rivers Hosp., 984 S.W.2d 593, 599 (Tenn. 1999) (quoting Montgomery v. Stephan, 101 N.W.2d 227, 229 (Mich. 1960)). As a result, stare decisis does not constrain this Court to maintain erroneous, "unworkable," or "badly reasoned" precedent. Payne, 501 U.S. at 827 (citing Smith v. Allwright, 321 U.S. 649, 665 (1944)); see also In re Estate of McFarland, 167 S.W.3d 299, 306 (Tenn. 2005) (stating that "obvious error"

in precedent justifies overruling it).  Thus, "if an error has been committed, and becomes plain and palpable, th[is] [C]ourt will not decline to correct it . . . ."  Arnold v. City of Knoxville, 90 S.W. 469, 470 (Tenn. 1905); see also, e.g., Rye v. Women's Care Ctr. of Memphis, MPLLC, 477 S.W.3d 235, 262-64 (Tenn. 2015) (overruling a seven-year-old decision because the summary judgment standards it adopted were unworkable and inconsistent with Tennessee law), petition for cert. docketed, 477 S.W.3d 235 (U.S. Mar. 17, 2016) (No. 15-1168); State v. Watkins, 362 S.W.3d 530, 556 (Tenn. 2012) (overruling a sixteen-year-old decision because the state constitutional test it adopted was unworkable and lacked textual or historical support); Mercer v. Vanderbilt Univ., 134 S.W.3d 121, 129-30 (Tenn. 2004) (overruling an eight-year-old decision that had adopted a minority rule and adopting instead the "better-reasoned" majority rule); Jordan, 984 S.W.2d at 600 (abrogating a ninety-six-year-old decision even though the statutory language it had interpreted remained the same).  Indeed, we have "a special duty" to correct erroneous court-made rules and would relinquish our own function by refusing to do so.  Rye, 477 S.W.3d at 263-64 (citing Dupuis v. Hand, 814 S.W.2d 340, 345 (Tenn. 1991); Hanover v. Ruch, 809 S.W.2d 893, 896 (Tenn. 1991)); see also State v. Menzies, 889 P.2d 393, 399 (Utah 1994) ("The general American doctrine as applied to courts of last resort is that a court is not inexorably bound by its own precedents but will follow the rule of law which it has established in earlier cases, unless clearly convinced that the rule was originally erroneous . . . and that more good than harm will come by departing from precedent." (citing John Hanna, The Role of Precedent in Judicial Decision, 2 Vill. L. Rev. 367, 367 (1957)).

We are persuaded that Moats was erroneous when initially decided and that more good than harm will be accomplished by overruling it.  First, the holding in Moats is contrary to the overwhelming weight of authority in this country, which recognizes the community caretaking doctrine as an exception to federal and state constitutional warrant requirements.  Of the three other states that at one time limited the doctrine to consensual police-citizen encounters, only North Dakota continues to impose this limitation.  See State v. Gill, 755 N.W.2d 454, 458 (N.D. 2008).  Second, the authority on which Moats relied to limit the community caretaking doctrine to consensual police-citizen encounters provides no support for the limitation.  As noted by the dissenting justices in Moats, the limitation originated with State v. Hawkins, 969 S.W.2d 936 (Tenn. Crim. App. 1997), was adopted by this Court without independent analysis in Williams, 185 S.W.3d at 315, and was subsequently repeated as dicta in a footnote in Day, 263 S.W.3d at 901 n.10.  In Hawkins, the Court of Criminal Appeals supported the limitation with a citation to United States v. Berry, 670 F.2d 583, 591 (5th Cir. 1982).  See Hawkins, 969 S.W.2d at 939.  In Williams, this Court cited only Hawkins and Cady in support of the limitation.  See Williams, 185 S.W.3d at 315.  Finally, in Day this Court repeated the limitation, citing only Williams as support and noting that Williams had relied upon Hawkins and Cady.  See Day 263 S.W.3d at 901 n.10.  Neither Berry nor Cady support limiting the community caretaking doctrine to third-tier consensual encounters.  Although Berry discusses the three tiers of police-citizen interactions, it contains no language limiting

- 13 -

community caretaking to consensual encounters.  Indeed, the word "community" does not even appear in <u>Berry</u>.  <u>See</u> <u>Berry</u>, 670 F.2d 583.  Furthermore, <u>Cady</u> provides no support for limiting the community caretaking doctrine to consensual police-citizen encounters.  <u>See</u> <u>Cady</u>, 413 U.S. 433.  To the contrary, the Court in <u>Cady</u> applied the doctrine to uphold the *warrantless search* of the defendant's vehicle as reasonable under the Fourth Amendment.  <u>Id.</u> at 441, 447.  The <u>Cady</u> Court nowhere limited the community caretaking doctrine to consensual police-citizen encounters.  Finally, contrary to the suggestion by the majority in <u>Moats</u>, the Tennessee Constitution does not require limiting the community caretaking doctrine to consensual interactions between citizens and police.  This Court has long held that article I, section 7 "is *identical* in intent and purpose to the Fourth Amendment."  <u>Williams</u>, 185 S.W.3d at 315 (emphasis added); <u>see also</u> <u>Donaldson</u>, 380 S.W.3d at 92 ("[I]n the context of traffic stops, the protections afforded by article I, section 7 of the Tennessee Constitution [are] coextensive with the protections afforded by the Fourth Amendment as defined in [<u>Whren</u>, 517 U.S. at 813]." (citing <u>Vineyard</u>, 958 S.W.2d at 734, 736)).  Having exposed the faulty foundation on which the <u>Moats</u> holding was based, we exercise our special duty to overrule <u>Moats</u> and disavow any other prior or subsequent Tennessee decisions limiting the community caretaking doctrine to consensual police-citizen encounters.  We emphasize that the community caretaking doctrine "is not relevant to determining whether police conduct amounted to a seizure in the first place."  <u>Luedemann</u>, 857 N.E.2d at 198-99.  Rather, the community caretaking doctrine "is analytically distinct from consensual encounters and [may be] invoked to validate a search or seizure as reasonable" under the Fourth Amendment and article I, section 7 of the Tennessee Constitution.  <u>See</u> <u>Id.</u>

### D.  Defining the Community Caretaking Exception in Tennessee

Having recognized the community caretaking exception, we turn our attention next to fashioning a test for its application which strikes a proper balance between the public's interest in having police officers assist citizens in need and the individual's interest in being free from unreasonable governmental intrusion.  Surprisingly, despite its widespread adoption, "[n]o single set of specific requirements" has emerged as the majority rule for applying the community caretaking exception.  <u>Ullom</u>, 705 S.E.2d at 122; <u>see also</u> <u>Deneui</u>, 775 N.W.2d at 237-39 (discussing the various tests); Michael R. Dimino, Sr., <u>Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness</u>, 66 Wash. & Lee L. Rev. 1485, 1498-1512 (2009) (discussing various community caretaking tests).

Some of the disagreement among courts as to the proper test focuses on the relevance of an officer's subjective motivations in determining whether the exception applies.  <u>Smathers</u>, 753 S.E.2d at 385 (providing citations to cases exemplifying each approach).  Some courts view the following language from <u>Cady</u> as requiring consideration of a police officer's subjective motivations:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Cady, 413 U.S. at 441; see, e.g., State v. O'Neill, 62 P.3d 489, 507 (Wash. 2003). We do not interpret this language as requiring consideration of a police officer's subjective intentions. Rather, in this passage, the Cady Court was distinguishing between the roles of state and federal law enforcement agents concerning automobiles.

Our framing of a test for the community caretaking exception must begin with the foundational principle that "[a]n action is 'reasonable' under the Fourth Amendment [and article I, section 7 of the Tennessee Constitution], regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.' The officer's subjective motivation is irrelevant." Brigham City, 547 U.S. at 404 (quoting Scott v. United States, 436 U.S. 128, 138 (1978)); see also Vineyard, 958 S.W.2d at 736 (holding that a traffic stop may be justified by probable cause under article I, section 7 "without regard to the subjective motivations of police officers"). As the dissenting justices in Moats noted, "[r]equiring the State to prove that a police action was motivated solely by community caretaking concerns would inappropriately shift the focus to the officer's (irrelevant) subjective motivations." Moats, 403 S.W.3d at 195 (Clark and Koch, JJ., dissenting). As the Wisconsin Supreme Court has noted, "to interpret . . . Cady to mean that an officer could not engage in a community caretaker function if he or she had any law enforcement concerns would, for practical purposes, preclude police officers from engaging in any community caretaker functions at all. This result is neither sensible nor desirable." Kramer, 759 N.W.2d 598, 609 (Wis. 2009). As the Appeals Court of Massachusetts succinctly explained,

> The law does not demand that an alert police officer must suppress his or her training and investigatory experience in carrying out the myriad of community caretaking functions society expects police officers to undertake for its protection. So long as the officer's conduct at the outset and throughout the course of exercising a community caretaking function is justified by the doctrine, the law does not attach significance to the officer's subjective motives.

Commonwealth v. Fisher, 13 N.E.3d 629, 633 (Mass. App. Ct. 2014) (internal citations omitted).

Having considered the tests developed in other jurisdictions, we adopt the test advanced by the dissenting justices in Moats. Specifically, we hold that the community caretaking exception will justify a warrantless seizure so long as

> the State establishes that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

Moats, 403 S.W.3d at 195 (Clark and Koch, JJ., dissenting); see also Kramer, 759 N.W.2d at 608. "Determining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case[,]" including "the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance." Moats, 403 S.W.3d at 195-96 (Clark and Koch, JJ., dissenting) (citing Salinas, 224 S.W.3d at 756; Pinkard, 785 N.W.2d at 605). We emphasize that when the community caretaking exception is invoked to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse. Smathers, 753 S.E.2d at 386.

### E. Applying the Community Caretaking Exception

Having set out an analytical framework that properly balances the public's interest in having police officers assist citizens in need and the individual's interest in remaining free from unreasonable governmental intrusions, we turn next to applying this test to the facts of this case and determining whether Sgt. Trivette's actions fall within the community caretaking exception to the warrant requirement.

Here, Sgt. Trivette was on routine patrol at 2:45 a.m., when he observed a vehicle that appeared to be parked in the roadway in front of a grocery store that was not open. Sgt. Trivette approached the car to do a welfare check, realized it was parked in a manner that blocked 75% of the entrance into the grocery store parking lot and that resulted in its left wheel protruding partially into the public roadway. The vehicle's engine was running and its lights were on. Sgt. Trivette parked on the roadway behind the defendant's vehicle and activated his patrol car's rear facing blue lights for safety reasons, so that neither the defendant's vehicle nor his own patrol car would be rear ended. Sgt. Trivette exited his patrol car, approached the driver's side door of the vehicle, and observed the defendant slumped over the steering wheel, despite a blaring radio, running engine, and headlights activated. After taps on the window failed to rouse the defendant, Sgt. Trivette opened the door to try again. Only then did he detect a strong odor of alcohol on

the defendant's breath and person and observe an open beer bottle in the center console. Sgt. Trivette tried to wake the defendant for about a minute before the defendant ever responded. Sgt. Trivette then asked the defendant to exit the vehicle, believing that the defendant was under the influence of some substance. The specific and articulable facts, viewed objectively and in the totality of the circumstances, reasonably warranted Sgt. Trivette's conclusion that a welfare check community caretaking action was necessary and appropriate. The facts confronting Sgt. Trivette suggested either a person in need of assistance or a potential threat to public safety, or both. Additionally, Sgt. Trivette's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need. The defendant was slumped over the steering wheel, with his car partially protruding into a public roadway and substantially blocking an entrance to a grocery store, albeit one not open at the time. Given the time, 2:45 a.m., location, and limited accessibility and availability of assistance from sources other than the officer, the risk of danger had the officer provided no assistance was substantial. Indeed, Sgt. Trivette would have been "derelict in his duty as a police officer" had he failed to take steps to determine the defendant's welfare. See Fisher, 13 N.E.3d at 633. Again, the defendant was slumped over the steering wheel, either asleep or unconscious, with his vehicle protruding partially onto the public roadway, placing him at risk of injury or death from a rear end collision. Having carefully considered the relevant facts, we conclude that Sgt. Trivette's actions were well within the community caretaking exception. By the time Sgt. Trivette asked the defendant to exit the vehicle and perform the field sobriety tests, he possessed at least reasonable suspicion that the defendant was under the influence of an intoxicant. Sgt. Trivette's actions thus were initially justified by the community caretaking exception and subsequently based upon reasonable suspicion.

## IV.  Conclusion

We overrule Moats, hold that the community caretaking doctrine is an exception to the warrant requirements of the Fourth Amendment and article I, section 7 of the Tennessee Constitution, and conclude that the seizure in this case was valid under the community caretaking doctrine. Accordingly, we conclude, on the separate grounds herein stated, that the courts below properly refused to suppress the evidence obtained as a result of the seizure. The judgment of the Court of Criminal Appeals is therefore affirmed. Costs of this appeal are taxed to the defendant, Kenneth McCormick, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE