IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 24, 2018 Session

**STATE OF TENNESSEE v. AMANDA A. TUCKER**

**Appeal from the Criminal Court for Washington County**
**No. 41965    Lisa Rice, Judge**

_____

**No. E2017-01283-CCA-R3-CD**

_____

The Defendant, Amanda A. Tucker, pleaded guilty in the Washington County Criminal Court to driving under the influence of an intoxicant (DUI). *See* T.C.A. § 55-10-401 (2017). The Defendant reserved a certified question of law regarding the arresting officer's encounter with and subsequent seizure of the Defendant, which she presents on appeal. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Jeff Kelly, District Public Defender; and Wesley K. Taylor, Assistant District Public Defender, for the appellant, Amanda A. Tucker.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Ken C. Baldwin, District Attorney General; Robin Ray, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to a police officer's discovery of the Defendant asleep in her running car in a Walgreens parking lot after a store manager's report to a 9-1-1 dispatcher. The Defendant was arrested after the officer noted an odor of alcohol and after she performed poorly on field sobriety tests. A police dog detected the presence of drugs after sniffing around the outside of the Defendant's car, and Alprazolam and Oxycodone were discovered in the Defendant's handbag inside the car. The Defendant was charged with DUI and two drug possession offenses. The Defendant filed a motion to suppress the evidence related to her seizure and the drug evidence. After receiving evidence at a suppression hearing, the trial court granted the motion as to the drug

evidence but denied the motion as to the officer's encounter with the Defendant that led to her arrest. The Defendant entered into a plea agreement, whereby she pleaded guilty to DUI, subject to the reservation of a certified question of law, and the drug charges were dismissed. The certified question of law presents the following question for our review:

> Whether the State met its burden by showing that the warrantless trespass and subsequent seizure of Defendant satisfied the factors set forth in *State v. McCormick*, 494 S.W.3d 673 (Tenn. 2016), such that Officer Hammer was exercising his community caretaking function after observing Defendant motionless and unresponsive in her vehicle?

Our review of the evidence is limited to that which is pertinent to the certified question of law.

At the suppression hearing, Johnson City Police Officer Bill Hammer testified that he responded to a Walgreens in Gray on May 29, 2016, as a result of a 9-1-1 call regarding a woman asleep in a white Scion. The 9-1-1 call was played for the judge. In it, a Walgreens manager reported that an unusual woman who appeared to be intoxicated had attempted to return merchandise without having a receipt or a driver's license. The manager said that when store personnel declined to process the return, the woman began walking around the store and that the woman was "acting really weird." The manager said that after the woman said she did not have a driver's license, the manager went outside to see if the woman had driven to the store. The manager said that a white woman was asleep in a white Scion in the parking lot. The manager said that the woman in the car was the driver. The manager provided a license plate number for the Scion. A second Walgreens employee talked to the dispatcher while the manager was outside obtaining the license plate number.

Officer Hammer testified that when he arrived at 10:34 p.m., he saw a white Scion in front of the store with its engine and headlights on. He said he parked in a parking space about two car lengths behind the Scion, which did not block the Scion from leaving. He did not activate his car's emergency lights. He said that he approached and looked into the driver's window and that he saw a white female, whom he identified as the Defendant, with her head down who "appeared to be possibly asleep." He said that he went to his car to check that its recording equipment was activated and that he returned to the Scion. He said that he knocked on the window in an attempt to wake the Defendant but that she did not move. He said he could see her breathing. He said she sat in the driver's seat with her hands and her cell phone on her lap. He said it appeared as if she had been holding her cell phone but had dropped it. He said that he continued

knocking on the window and door but that she did not move. He acknowledged that he did not see vomit or blood in the Defendant's car or observe her have convulsions.

Officer Hammer testified that he was unsure "what was going on" and that if the Defendant were asleep, she was deeply asleep because he could not rouse her despite his "pecking pretty hard." He said that in order to check on the Defendant's safety, he opened the unlocked door, which caused the Defendant to raise her head and look at him. He said he asked her whether she was okay and that she mumbled something he could not understand. He said he inquired about her well-being a second time and that she mumbled for several seconds before he was able to understand her. He said she stated she had been asleep because she had just left work and had been tired. He said he smelled an odor of alcohol coming from her or the car. He said she denied two or three times that she had been drinking. He said that when he asked for her driver's license, she looked through her handbag for several seconds, possibly up to a minute, passing over her wallet before eventually taking her license from her wallet. He said she again denied that she had been drinking. He said that after talking to her for "probably several minutes," he asked her to get out of the car and that she was slow and unsteady when she stepped out. He said that he administered field sobriety tests, that she "did poorly," and that he arrested her for DUI. He said that he called for a police dog unit to come to the scene because he suspected that the Defendant might be under the influence of something in addition to alcohol because the odor of alcohol was not strong.

The video recording from Officer Hammer's car was played for the judge. The recording was consistent with Officer Hammer's testimony about the encounter.

The trial court made the following pertinent findings of fact and conclusions of law:

> Officer Hammer, subject to calls from non-law enforcement individuals which have been played and stipulated to on the 911 tape for purposes of this Motion, expressing concern about a person that appeared to be asleep in a vehicle parked in a parking lot at the Walgreen's in Gray, which is open twenty-four hours, but the concern was basically tied to another occupant of that vehicle apparently in the store that "was weird looking or acting really strange or really weird," and then that caused concern from the store personnel about the driver of this white Scion. Clearly it says they thought she was asleep with [the] car running but when the 911 dispatcher asked if she was breathing, the personnel that called from the store, somebody named Stephanie I think, said that she didn't know if she was breathing. They gave the tag number and the description of the vehicle to

-3-

the dispatcher that was then, of course, transmitted on to the officer and that's when Officer Hammer appears on the scene and the video clearly shows him knocking repeatedly and successively louder on the window of this vehicle numerous times. I didn't count but it was many, many times that the officer tried to rouse [the Defendant] from whatever circumstances she was in, whether she was asleep, whether she was passed out, whether she was not breathing, he could not rouse her and you could clearly hear on the video loud and repeated knocking. At that point, he opens the door and asked her if she was okay, and almost immediately asked her about the smell of alcohol. Under the *McCormick* case and the holding in that case reads as follows: "Specifically we hold that the community caretaking exception will justify a warrantless seizure so long as the State establishes (1) that the officer possess specific and articulable facts which viewed objectively . . . from the officer's standpoint, and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior in the scope of the intrusion [was] reasonably restrained and tailored to the community caretaking need." I do believe the State's established facts [which are] sufficient to fit squarely into that two-prong test for purposes of Officer Hammer's DUI probable cause and further investigation of that crime. And in light of these circumstances and the factors that the defense listed in their argument, I think [defense counsel], you're absolutely right, and many of those factors such as the level of distress, you've got a person appearing to be asleep, passed out, unresponsive, he could see her breathing but didn't know what her circumstances were and she did not respond or arouse to repeated and successively [louder] efforts of knocking on the part of the officer. It was 10:30, not excessively late, but still, someone can have a medical problem any time of day. The officer was specifically dispatched by other persons who were concerned about the situation and asked for assistance. The immediate contact based on the officer's testimony indicated that [the Defendant] was mumbling and was not able to articulate readily her circumstances. So the officer, I think, objectively, from what he observed at the time, is squarely within the two-prong test established by *McCormick* in February of last year based on Justice Clark's opinion. . . . [T]hat part of the Motion is respectfully denied.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23

(Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629; *see Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Three levels of police-citizen interactions exist: (1) a full-scale arrest, which requires probable cause, (2) a brief investigatory detention, which requires reasonable suspicion of wrongdoing, and (3) a brief police-citizen encounter, which does not require objective justification. *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). Only the first two categories constitute a "seizure" for purposes of the Constitution. *Id.*

For purposes of the present case, the parties do not dispute that a warrantless search and a seizure occurred. Within the context of warrantless searches and seizures, the courts have recognized certain exceptions to the warrant requirement. *See, e.g., State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (listing some of the commonly recognized exceptions to the warrant requirement). The State has the burden to demonstrate that a warrantless search falls within an exception to the warrant requirement. *Id.*

One exception to the warrant requirement is pursuant to the community caretaking doctrine, whereby police officers may, separate from any duties related to the detection or investigation of criminal activity or collection of evidence related to criminal activity, engage in activities that are in furtherance of the general safety and welfare of citizens who may be in peril or otherwise in need of assistance. *State v. McCormick*, 494 S.W.3d 673, 680-83 (Tenn. 2016); *see Cady v. Dombrowski*, 413 U.S. 433 (1973). Thereby, a warrantless seizure is justified if the State establishes the following:

> (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a

conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

*McCormick*, 494 S.W.3d at 687 (quoting *State v. Moats*, 403 S.W.3d 170, 195 (2013) (Clark and Koch, JJ., dissenting), *overruled by McCormick*, 494 S.W.3d at 684). "'Determining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case[,]' including 'the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance.'" *Id.* (quoting *Moats*, 403 S.W.3d at 195-96 (Clark and Koch, JJ., dissenting)).

The Defendant contends that the trial court erred in applying the community caretaking exception to the warrant requirement in its denial of her motion to suppress as to the police encounter. The trial court utilized the *McCormick* framework and determined that specific and articulable facts existed to support a conclusion that a community caretaking action was needed and that Officer Hammer's behavior and the scope of his intrusion were reasonable in restraint and were tailored to the community caretaking need. *See id.*

The record reflects that Officer Hammer arrived at the scene based upon a 9-1-1 call regarding a person who appeared to be asleep in a parked, running car with its headlights illuminated. The caller, who was the manager of the store where the car was parked, thought the driver was with a person inside the store who appeared to be intoxicated, had attempted to return merchandise without a receipt or identification, and had acted strangely inside the store. Officer Hammer arrived at 10:34 p.m., observed the driver who matched the description and who was in the same condition as had been reported in the 9-1-1 call, and approached the vehicle to check on the driver. He was unable to rouse the Defendant, who was alone in the car, by knocking successively louder, despite several attempts and verbal inquiries. The Defendant did not move and was unresponsive during Officer Hammer's attempts to rouse her. Officer Hammer observed the Defendant's cell phone and hands in a position which suggested she had been holding the cell phone until losing consciousness or falling asleep. Officer Hammer opened the car door in order to check on the Defendant's welfare, and she began mumbling unintelligibly when he inquired about her well-being. He eventually understood her to say that she had been sleeping because she was tired, and he smelled alcohol despite her repeated denials that she had been drinking.

The record supports the trial court's determination that Officer Hammer possessed specific and articulable facts to support a conclusion that a community caretaking function was needed to assist the Defendant, who appeared to be asleep or unconscious behind the wheel of a running car parked in a public place. *See id.* The Defendant appeared to have lost consciousness or to have fallen asleep suddenly, based upon the position of her hands and her cell phone, and she was unresponsive when Officer Hammer knocked and addressed her. The record also supports the court's conclusion that Officer Hammer's behavior and the scope of his intrusion were reasonable and tailored to the need for a community caretaking action in light of the facts and circumstances of the case. *See id.* He first knocked and addressed the Defendant through her car window, making repeated attempts to rouse her. The Defendant was alone in the car. When she remained unresponsive, he opened the driver's door to check on her and, at this point, smelled alcohol. He addressed her, and she mumbled incoherently. He asked to see her driver's license, and she had difficulty retrieving it. By this point, Officer Hammer had reasonable suspicion that the Defendant was under the influence of an intoxicant, warranting his further investigation.

In reaching our conclusion, we have considered two factually similar cases, *McCormick*, and *State v. Jayme Conkin*, No. E2015-01286-CCA-R3-CD, 2016 WL 4708356 (Tenn. Crim. App. Sept. 7, 2016). Both cases involved a police officer approaching an unresponsive person seated in the driver's seat of a running vehicle.

In *McCormick*, the responding officer was on patrol in the early morning hours when he noticed an SUV parked partially on the roadway and partially blocking the entrance to a store. The engine was running, and the lights were on. The officer conducted a welfare check on the driver, the defendant, by tapping on the driver's window. The officer received no response and noticed loud music blaring from the SUV. When he opened the driver's door to check on the defendant, the officer found the defendant slumped over the steering wheel with sauce on his face, food on his lap, and an open beer container in the center console. The officer smelled alcohol and tried for about one minute to wake the defendant before the defendant responded. *McCormick*, 494 S.W.3d at 676. The supreme court held that the officer's inquiry into the defendant's welfare was a proper exercise of the community caretaking function. *See id.* at 688-89. The court stated, as well, that by the time the officer asked the defendant to get out of the car and perform field sobriety tests, the officer had reasonable suspicion that the defendant was under the influence of an intoxicant. *See id.* at 689.

In *Jayme Conkin*, an officer responded to the parking lot of a business at which employees had called to report that two people were unconscious or asleep in a car. The

car was running and had its reverse and brake lights illuminated. The responding officer thought that the car was in gear. The driver's window was down, even though it was January and cold. After a backup officer arrived, the first officer approached the defendant, who was in the driver's seat. The officer tried to rouse the defendant verbally, but she did not respond initially. The officer reached into the car and shook the defendant to wake her, and he noticed that her speech was slurred and that she was lethargic. He administered field sobriety tests, on which the defendant performed poorly. *Jayme Conkin*, 2016 WL 4708356, at *1-2. A panel of this court said that, in view of the facts and circumstances, the officer's actions fell within the community caretaking function, noting that he approached the car in order to check on the defendant's welfare and out of safety concerns for himself and the general public that the car was in gear. *Id.* at *8. This court concluded that the officer's behavior "was initially directed at making the car safe" and that it was after he began speaking to her that he noticed signs of intoxication. *Id.*

We have considered, as well, the Defendant's citations to *State v. Lowe*, 439 S.W.3d 326 (Tenn. Crim. App. 2013), and *State v. Jerry R. Shouse*, No. M2013-00863-CCA-R3-CD, 2014 WL 1572451 (Tenn. Crim. App. Apr. 21, 2014). Both of those cases, while sharing some factual similarities to the case at bar, predate our supreme court's adoption of the community caretaking exception to the warrant requirement in *McCormick*. The cases cited by the Defendant rely upon *Moats*, which limited the community caretaking function of law enforcement to consensual police-citizen encounters. *See Moats*, 403 S.W.3d at 184-85. This aspect of *Moats* was overruled by *McCormick*. *See McCormick*, 494 S.W.3d at 684. We conclude that the cases cited by the Defendant are inapt.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE