IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016

## STATE OF TENNESSEE v. MICHAEL A. ALDERSON

**Appeal from the Circuit Court for Maury County**
**No. 22414     Stella L. Hargrove, Judge**

_____

**No. M2015-01395-CCA-R3-CD – Filed September 29, 2016**

_____


The defendant, Michael A. Alderson, was convicted by a jury of introducing drugs into a penal institution, a Class C felony, after he was arrested for an unrelated offense and disburdened himself of a small amount of marijuana in the "trap" room leading to the Maury County jail. The trial court sentenced the defendant as a Range II offender to ten years' imprisonment. On appeal, the defendant asserts that he was denied his right to self-representation. The defendant also argues that the marijuana should have been suppressed because his initial arrest was unlawful, and he asserts error in sentencing. Because we conclude that the trial court erred in denying the defendant his right to self-representation, we reverse the judgment and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

William Joshua Morrow (on appeal), Lawrenceburg, Tennessee; Lee E. Brooks (at trial), Spring Hill, Tennessee; and Cory Ricci (at first hearing on self-representation), Columbia, Tennessee, for the appellant, Michael Alonzo Alderson.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Brent Cooper, District Attorney General; and Dan Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant's initial arrest came about in connection with illegal drugs which were discovered during law enforcement's pursuit of Marcus Jones, the defendant's uncle. After being arrested and entering the jail, the defendant was discovered to have attempted to dispose of a miniscule amount of marijuana in his shoe, and he was charged with the offense that is the subject of this appeal. The defendant moved to have the marijuana found in his shoe suppressed, asserting that his initial arrest was illegal.

Debbie Farris, a bonding agent, testified at the suppression hearing that she had been searching for Mr. Jones on January 31, 2013, and that she saw him that morning. Mr. Jones eluded her at the time, but she continued to search for him, keeping in contact with authorities. Ms. Farris observed the vehicle Mr. Jones had driven that morning abandoned, and she then saw the defendant. Ms. Farris knew the defendant had lived with Mr. Jones, and she and the defendant "exchanged words." The defendant made some minor threats and told her she would have to try harder if she wanted "to get them tied up." As she drove off, she observed a white car with a Hello Kitty sticker in the window, which she knew belonged to a woman with whom Mr. Jones was involved. She could see that Mr. Jones was driving. In her mirror, she saw the defendant get in the car. Ms. Farris drove around the block to avoid startling Mr. Jones. When she approached the vehicle, Mr. Jones sped off, and she followed. She lost sight of the vehicle for a few seconds as it rounded a curve. When she next saw the vehicle, it was in a parking lot and had collided with something. The defendant exited the passenger's side of the car and said, "I wasn't in that car. I don't know what you're talking about." Mr. Jones had trouble exiting the driver's side of the vehicle, fell as he rolled down a hill, and fled into the woods. Ms. Farris testified that she was actually on the telephone with law enforcement at the time that Mr. Jones attempted to flee in the vehicle.

Officer Matthew Burns responded to the site of the accident, and he saw the defendant walking approximately one hundred yards from the vehicle. Officer Burns discovered a small bag of marijuana on the floorboard of the driver's side of the vehicle, and he discovered a plastic bag of cocaine tucked between the driver's seat and the center console. The cocaine consisted of two small bags of cocaine inside a larger bag. Officer Burns used his scales and found that the cocaine weighed approximately half a gram, but he acknowledged he did not know if the scales had been calibrated. Testing through the Tennessee Bureau of Investigation ("TBI") confirmed that the drugs consisted of 4.66 grams of marijuana and 0.54 grams of cocaine. The drugs were found near a school, and Officer Burns told Sergeant Samuel Barnes that he intended to charge both the defendant and Mr. Jones with a felony based on the discovery of the drugs. Officer Burns

2

acknowledged that he knew from Ms. Farris that Mr. Jones had been driving, and he acknowledged that all the drugs were found on the driver's side. Officer Burns's initial report mentioned charging Mr. Jones but did not say he intended to charge the defendant with a crime. Officer Burns was not scheduled to work over the next several days and did not obtain the warrants against Mr. Jones or the defendant.

On February 4, 2013, law enforcement went to an apartment building to arrest Mr. Jones on a separate pending matter. Sergeant Barnes testified that he believed law enforcement arrived before lunch. At the apartment, they found a woman, Mr. Jones, and the defendant. Mr. Jones was searched and removed to a patrol vehicle. The defendant was instructed to stay on the couch. Sergeant Barnes checked and found no warrant for the defendant's arrest. Because Sergeant Barnes knew that the defendant had been in the vehicle in which the drugs were found, he contacted Officer Burns, who told him that he would go immediately to obtain a warrant for the defendant's arrest. Sergeant Barnes testified that the defendant was not free to leave the apartment, that he did not give the defendant *Miranda* warnings, and that he did not hear anyone give the warnings to the defendant. The defendant was detained for approximately one hour at the residence. Officer Burns stated that his report from February 4, 2011, noted that both Mr. Jones and the defendant had stated they were in the vehicle but neither would admit to driving or wrecking the vehicle. Sergeant Barnes stated that it was "possible" that he conveyed to Officer Burns that the defendant confessed to being in car, but he did not recall doing so. The defendant was arrested and transported to the jail. The charges alleging that the defendant possessed the cocaine and marijuana found in the wrecked vehicle were ultimately dismissed.

The warrant for the drugs found in the car driven by Mr. Jones was served at 12:40 p.m., and Officer Burns testified that it was issued immediately prior to the time it was served. The warrant was served after the defendant had arrived at the jail.

The trial court denied the motion to suppress, concluding that at the time of the arrest, Sergeant Barnes had probable cause to believe that the defendant had been in possession of over 0.5 grams of cocaine, individually packaged, near a school on January 31, 2013, and that the defendant's arrest was therefore not a violation of his Fourth Amendment rights.

Prior to trial, the defendant expressed dissatisfaction with his attorney. The defendant's attorney filed a motion to withdraw on July 20, 2014, and the trial court held a hearing on July 24, 2014. The defendant's counsel explained his motion to withdraw by stating that there were "fundamental communication issues" and "one other issue." The defendant stated he would not be able to hire an attorney, that he was legally blind, and that he had just gotten out of prison but would soon commence receiving social security

support. The trial court indicated that it intended to appoint the public defender and would order the defendant to pay an "appointment fee." The defendant responded, "I don't need a lawyer….I want to represent myself." The trial court then asked the defendant what he would do if there were a hearsay issue and how many exceptions there were to the rule against hearsay. The defendant stated he would lodge objections and go to the law library. The trial court briefly questioned the defendant regarding his understanding of the possible prison time and the release eligibility associated with the offense. The trial court told the defendant it would return to the issue because it would need "to go through this extensive voir dire about your representation." The judge then told the defendant's counsel that he would permit counsel to withdraw. The transcript shows that when the court returned to the issue later in the day, it found that the public defender had a conflict and appointed the defendant a new attorney. The trial court did not conduct the promised extensive voir dire but merely stated, "I'm not going to let you represent yourself."

Approximately one week prior to trial,[1] the defendant renewed his objection to his legal representation before a different judge. Trial counsel informed the court that the defendant's motion to represent himself had previously been denied. The defendant's trial attorney then stated that the defendant wished to make a motion for counsel to withdraw and that the defendant desired either to hire his own counsel or to proceed pro se. The defendant told the court that he would be able to hire his own attorney, that he was not asking for a continuance, and that he simply did not want trial counsel to represent him because he felt trial counsel did not understand that the offense required unlawful intent. The trial court and trial counsel looked at the statute and determined that the offense had an element of "unlawful intent." Without further discussion, the judge stated, "I'm not going to let you change lawyers." The court asked if there was a written motion to withdraw, and trial counsel stated that he had not had the opportunity to file one because the issue had only arisen that morning. The trial court informed the defendant that if the defendant was trying to postpone the trial, it would revoke his bond. The defendant's attorney continued to represent him at trial, which was presided over by a judge who had not heard either of the motions for self-representation.

At trial, Sergeant Barnes testified that, in the course of serving a warrant on Mr. Jones, he became aware that there was a warrant at the sheriff's office to be served on the defendant and that the defendant was transported to the jail by another officer. Sergeant Barnes stated that he always gave arrestees entering the jail a speech affording them the opportunity to let police know if they possessed contraband, and he stated that patrolmen

---

[1]The transcript of this proceeding shows that it took place on November 12, 2014. While the transcript of the trial is dated October 19-20, 2014, the defendant points to the technical record to demonstrate that the October date on the trial transcripts is a clerical error and that the trial took place November 19-20, 2014.

serving under him also would give this speech.  The sally port entrance to the jail had a sign prohibiting firearms but did not have a sign regarding drugs.

Sergeant Brandon Park testified that he transported the defendant and that a deputy-in-training accompanied him.  The defendant was patted down for weapons but was not searched otherwise.  Sergeant Park testified that it was his habit to ask arrestees to stand by the jail door while he asked for entrance through the intercom.  He testified that it was his habit to ask arrestees if they had anything illegal on their person, including drugs or weapons, or if they had prescription medication.  He would normally add that if such items were discovered in jail the arrestee would be "in even more trouble."  He did not recall giving the defendant this warning, but he stated that "everybody that I take to that door, that's the speech that I gave them -- give them and if I -- I would have given him the same speech as I give everybody else."  He acknowledged that prior to 2005, when he worked as a transportation officer to move prisoners between secure locations, he did not habitually give that speech.

The defendant entered the building and was put into an area known as the "trap," which featured interlocking doors such that only one door can be opened at one time. Although there were some holding cells which opened into the trap, prisoners were never housed there, and there was no way for someone in the trap to have contact with a prisoner in one of the holding cells.  The State introduced a video of the defendant in the trap.  The video shows the defendant remove one shoe, kick something small to the side, and replace the shoe. The defendant was alone the entire time he was in the trap, until a police officer escorted him from the room.  Less than twenty minutes after the defendant had come through the trap, Officer Sherry Johnson entered the trap to go outside.  Officer Johnson did not believe anyone else had been through the area since the defendant left. As she walked through, she discovered a small plastic bag filled with what appeared to be marijuana. Officer Johnson retrieved a video of the trap room from Lieutenant Deborah Wagonschutz.  Officer Johnson then showed the video to Sergeant Barnes, who obtained a new warrant against the defendant for introducing drugs into a penal institution.  TBI testing revealed that the substance was approximately 0.03 ounces of marijuana.

The jury convicted the defendant of the introduction of contraband into a penal institution and fined him one thousand dollars.  At the sentencing hearing, the defendant's probation officer testified that the thirty-two-year-old defendant had been in custody for most of the previous ten years.  The defendant violated either probation or parole on four previous occasions. He was also expelled from two treatment-type programs, and he had positive drug screens which did not result in the filing of a violation of his conditional release.

5

Patricia Bullock, the defendant's mother, testified that the defendant began to suffer from eye disease when he was in the fifth grade and that he began to get into trouble when he could not drive or participate in sports like other children his age. The defendant could not maintain employment because of his eyes. She testified that doctors had told her that marijuana would help with his eye condition but that they could not prescribe it for him because it was illegal. The defendant obtained his GED in prison and received a top score. She testified that the defendant was not violent and that he helped her with the care of his children and her other grandchildren.

Rakisha Gant, the mother of the defendant's two-year-old child, testified that the defendant had never consumed or possessed drugs in front of her or their child. Ms. Gant testified that on the date of the defendant's arrest, he had been in her apartment, which was above the apartment where Mr. Jones was arrested. The defendant went to take the trash out and planned to borrow a lighter from Mr. Jones so that he could smoke a cigarette. He was then arrested. She testified that he suffered pain from his eye condition, that he was not violent, and that he helped with the care of his child.

The defendant also testified at the hearing. The defendant acknowledged that the marijuana in his shoe belonged to him, but he testified that he only smoked it to treat his eye condition and that he never did so in front of his child. He stated that he was remorseful for having brought it to jail but that Sergeant Park did not in fact give him a warning about taking it into the building. He testified that he understood that it was illegal to have the marijuana in the building, but he explained that he did not intend to pass it on to another inmate and that the only reason he did not surrender it was that he was on parole at the time and knew his parole would be revoked if he acknowledged possessing it. The defendant stated that he had received the second highest GED score in the state. He told the court that he would not smoke marijuana if he was granted probation but that he would test positive for marijuana if tested that day. The defendant acknowledged having been expelled from a treatment program and a drug education class. He stated that the drug education class addressed only crack cocaine and was not useful to someone who smoked marijuana. The treatment center expelled him because it was trying to unlawfully obtain his social security income.

The trial court found two enhancement factors: that the defendant had a previous history of criminal behavior in addition to that necessary to establish the range and that the defendant was on parole at the time the offense was committed. The court found that the defendant's criminal record extended back to when he was sixteen years old and that he violated his probation on numerous prior occasions by not reporting, moving without notice, and committing new offenses. The trial court found that the defendant had several violations involving cocaine that could not be explained by a need to treat a medical condition. The trial court noted that the defendant tested positive for marijuana more

6

than once without having his probation revoked, that he was discharged from a treatment program for an "ambivalent attitude and noncompliant behavior," and that he was discharged from another program for disruptive behavior. The trial court stated that the defendant had poor potential for rehabilitation and high potential for reoffending, noting that the defendant acknowledged having smoked marijuana earlier in the week. The court found that the interests of society would be served by imprisonment and that society needed to be protected from the defendant's future criminal conduct. The court also found that confinement was suited to provide an effective deterrent and that probation would depreciate the seriousness of the offense. The trial court sentenced the defendant to serve ten years as a Range II offender.

## ANALYSIS

### I. Motion to Suppress

The defendant asserts that the trial court erred in denying his motion to suppress because his initial arrest was illegal and the discovery of the marijuana was the fruit of his illegal detention. The State counters that law enforcement had probable cause to arrest the defendant based on the discovery of the cocaine in the wrecked vehicle.[2]

On appeal, a trial court's findings of fact during a motion to suppress are binding on the appellate court unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* The party prevailing at the hearing is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of law to the facts is reviewed de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Article I, section 7 of the Tennessee Constitution also guarantees

---

[2] At trial, the State also argued that the defendant's act of taking the marijuana into the penal facility was a subsequent illegal action and should not in any event be suppressed under the "fruit of the poisonous tree" doctrine. The State has abandoned this argument on appeal, and we do not address it. *See* Wayne R. Lafave, 6 *Search & Seizure* § 11.4(j) (5th ed.) (noting that while courts frequently admit evidence of new crimes, such as a physical attack on an officer, committed after a Fourth Amendment violation, "[i]ncriminating admissions and attempts to dispose of incriminating evidence are common and predictable consequences of illegal arrests and searches, and thus to admit such evidence would encourage such Fourth Amendment violations in future cases").

the right of the people to "be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." "[T]hese constitutional provisions are designed 'to prevent arbitrary and oppressive interference [by enforcement officials] with the privacy and personal security of individuals.'" *Daniel*, 12 S.W.3d at 424 (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)).

The Tennessee Supreme Court has recognized three tiers of police-citizen interactions: (1) a full-scale arrest requiring probable cause, (2) a brief investigatory stop, requiring reasonable suspicion of criminal activity, and (3) a brief consensual police-citizen encounter requiring no objective justification. *State v. Kenneth McCormick*, No. M2013-02189-SC-R11-CD, 2016 WL 2742841, at *4 (Tenn. May 10, 2016). The first two categories rise to the level of a seizure. *State v. Day,* 263 S.W.3d 891, 901 (Tenn. 2008). A seizure occurs when, in view of all the circumstances surrounding the incident, a reasonable person would not feel free to terminate the interaction and leave. *Id.* at 902. An arrest further requires "actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." *State v. Echols*, 382 S.W.3d 266, 278 (Tenn. 2012) (quoting *State v. Crutcher*, 989 S.W.2d 295, 301-02 (Tenn. 1999)).

The prohibition against unreasonable searches and seizures afforded by the federal and state Constitutions is accompanied by the general rule that a warrantless search or seizure is presumed unreasonable and that any evidence discovered through such a search is subject to suppression. *Day,* 263 S.W.3d at 901. This exclusionary rule is "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Herring v. United States*, 555 U.S. 135, 139-40 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

The defendant was initially arrested at the apartment prior to the time that the arrest warrant was issued. The testimony at the hearing established that he was never free to leave the apartment and that he was at some point handcuffed and transported in a police vehicle to the station. The warrant was not issued until immediately prior to the time it was served at the prison. Accordingly, law enforcement did not arrest the defendant pursuant to a warrant.

The warrant requirement is subject to certain "well-delineated" and "jealously and carefully drawn" exceptions. *State v. Richards*, 286 S.W.3d 873, 878 (Tenn. 2009) (quoting *Day,* 263 S.W.3d at 901). A warrantless arrest may be effected when "a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." T.C.A. 40-7-103(a)(3) (2010); *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014). To justify a warrantless search incident to a lawful arrest, the State must show that: (1) the arresting officer had probable cause to believe that the defendant had engaged or was engaging in illegal activity; (2) the probable cause must

attach to an offense for which full custodial arrest is authorized; (3) the arrest must occur prior to or contemporaneously with the search; and (4) the search must be incident to, and not the cause of, the arrest. *Richards*, 286 S.W.3d at 878 (noting that probable cause must be particularlized with respect to the individual). In evaluating the legality of a search or seizure, we keep in mind that the touchstone of the Fourth Amendment is reasonableness. *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007) (citing *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)).

The defendant concedes that police had probable cause to suspect that a felony had been committed when they discovered the cocaine and marijuana in the wrecked vehicle near the school. However, he contends that his arrest was illegal on two theories. First, he asserts that probable cause particularized with respect to him could not arise from Ms. Farris's information that the defendant had been in the car because the State failed to establish that Ms. Farris was a citizen-informant. Second, the defendant argues that even if Ms. Farris's information that the defendant was a passenger in the car could be considered in the probable cause determination, the police still lacked probable cause to believe that the defendant, as opposed to Mr. Jones, was guilty of the offense.

Information provided by a citizen-informant is presumptively reliable. *Bishop*, 431 S.W.3d at 38. "[I]f the source of the information is a person (1) who is known to the police, (2) who is not part of the 'criminal milieu,' and (3) whose motivation is to aid the police without any expectation of remuneration, then the information is deemed reliable and is sufficient to provide probable cause for arrest." *Id.* In contrast, information provided "(1) by a professional informant who gives tips for money or favors, (2) by a person from the 'criminal milieu' who may have an ax to grind, or (3) by an anonymous informant" is not presumed credible. *Id.* When the informant is not a citizen-informant, the affidavit must show "(1) the basis for the informant's knowledge and (2) the reliability of the informant or the information." *Echols*, 382 S.W.3d at 279. Both prongs of this test must be satisfied. *State v. Carter*, 160 S.W.3d 526, 534 (Tenn. 2005). However, independent police corroboration may make up for a deficiency in either prong. *Id.*

Here, Ms. Farris was not anonymous, not of the criminal milieu, and her information that the defendant was a passenger in the car was not given in exchange for any remuneration. In any event, she testified that she was relaying information to the police as she pursued Mr. Jones, showing her basis of knowledge, and the reliability of her statement that the defendant was a passenger was corroborated by Officer Burns's observation of the defendant on foot approximately one hundred yards from the accident site. Accordingly, law enforcement officers were entitled to rely upon Ms. Farris's knowledge that the defendant was present in the vehicle in determining if there was probable cause to arrest the defendant.

The defendant contends that, even if the police could rely on Ms. Farris's observation that he was a passenger in the vehicle, the discovery of cocaine and marijuana in the vehicle did not give rise to probable cause to suspect that the defendant, rather than Mr. Jones, had committed a felony. In essence, he concedes that there was probable cause to believe that Mr. Jones had committed a felony. However, he points to circumstances which he alleges negate probable cause to believe the defendant himself had committed a crime, including the fact that the car did not belong to him, that Mr. Jones was the driver, that Ms. Farris witnessed the defendant enter the vehicle and remain inside for only a few minutes, that the marijuana was discovered on the driver's side floorboard, and that the cocaine was discovered tucked between the driver's seat and the center console.

The determination of probable cause is a determination of "whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Day*, 263 S.W.3d at 902 (quoting *Goines v. State*, 572 S.W.2d 644, 647 (Tenn. 1978)). Probable cause must be more than mere suspicion. *State v. Lawrence,* 154 S.W.3d 71, 76 (Tenn. 2005). Probable cause is a concept that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175 (1949). The United States Supreme Court has written that probable cause is "incapable of precise definition or quantification into percentages" and must be evaluated based upon the totality of the circumstances. *Maryland v. Pringle,* 540 U.S. 366, 371 (2003). Probable cause may attach to a particular individual via the inference that the individual is involved in a common criminal enterprise with another criminal actor. *Richards*, 286 S.W.3d at 884 (Koch, J., dissenting). In determining probable cause, the court should consider the collective information known to law enforcement, provided that there is a nexus of communication between the arresting officer and any other officer with relevant information. *Bishop*, 431 S.W.3d at 36. Such a nexus is established by evidence that the officers are relaying information or that one officer is acting at another's direction. *Id.*

In *Maryland v. Pringle*, the United States Supreme Court was presented with the question of whether police had probable cause to arrest a passenger in a vehicle where drugs were discovered. *Pringle*, 540 U.S. at 370. In *Pringle*, the vehicle had three occupants: the driver, a passenger sitting in the back, and the defendant in the front passenger's seat. *Id.* at 368. Pursuant to a consent search, police discovered $763 in the glove box and five baggies of cocaine hidden behind the raised armrest in the back seat. *Id.* The Court concluded that "an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over,

10

the cocaine." *Id.* at 372.  The Court found it significant that passengers in a car would frequently be engaged in a common enterprise with the driver.  *Id.* at 373.  The Court also found it significant that none of the occupants of the car claimed the cocaine or gave information regarding its ownership.  *Id.* at 374.

We conclude that, under *Pringle*, law enforcement had probable cause to arrest the defendant.  Here, as in *Pringle*, the drugs were discovered in the shared vehicle but closer to a seat that had been occupied by someone other than the defendant.  While the *Pringle* court ascribed some significance to the cash found in the glove compartment of the vehicle, *Id.* at 372 n.2, the Court ultimately determined that law enforcement could infer that all of the occupants possessed the cocaine. Although the defendant here was not seated by a glove box containing a large pile of cash, we do not think that that detail is determinative.  The cocaine was tucked next to the center console which the driver and passenger shared.  We note also that law enforcement testified that the cocaine appeared to be packaged for individual resale.  As in *Pringle*, law enforcement could have inferred that the defendant was engaged in a common criminal enterprise with the driver and that he and the driver jointly possessed the drugs.  Neither occupant claimed ownership of the drugs.  Testimony at the hearing established a nexus of communication between law enforcement officers.  Accordingly, we conclude that the trial court did not err in denying the motion to suppress.

## II. Self-Representation

The defendant next premises relief on the contention that he was denied his constitutional right to self-representation.  At the July 24, 2014 hearing, the defendant's attorney moved to withdraw.  The defendant, when questioned about his financial resources, asserted that he did not need a lawyer and that he wanted to represent himself. The trial court asked a few questions about the defendant's education and legal knowledge, and it stated that it would later conduct an extensive voir dire on the subject. The attorneys present noted for the court that the public defender's office had a conflict in the case.  When the trial court returned to the subject, the judge, without further inquiry, told the defendant, "I'm not going to let you represent yourself."  The trial court did not state any basis for the denial.  The defendant revisited the issue with his new attorney in November, one week prior to trial.  The defendant's attorney told the court that the defendant wished him to withdraw and wished to either proceed pro se or to hire counsel. The trial court asked why the defendant wanted to delay trial, and the defendant responded that he did not seek a continuance and that he was financially able to hire an attorney.  After some discussion of the statute the defendant was charged with violating, the trial court told the defendant, "I'm not going to let you change lawyers."

11

The accused in a criminal prosecution is guaranteed the right to counsel by the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. As an alternative to that right, the accused may instead assert the right to self-representation. *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009). Clearly, both rights cannot be simultaneously asserted. *Id.* The right to self-representation is guaranteed by the same constitutional provisions which provide for the right to counsel. *Id.* "The right to represent oneself exists '[d]espite the fact that its exercise will almost surely result in detriment to both the defendant and the administration of justice.'" *State v. Robert Hood*, No. W2004-01678-CCA-R3-DD, 2005 WL 2219691, at *11 (Tenn. Crim. App. Sept. 13, 2005) (quoting *State v. Fritz,* 585 P.2d 173,177 (Wash. Ct. App. 1978)).

The trial court's determination regarding whether a defendant has properly exercised the right to self-representation and waived the right to counsel is a mixed question of law and fact reviewed de novo with a presumption of correctness. *State v. Hester*, 324 S.W.3d 1, 29-30 (Tenn. 2010). When the trial court erroneously denies the defendant's request for self-representation, the error is structural constitutional error and requires automatic reversal. *Id.* at 30.

The exercise of the right to self-representation requires the waiver of the right to counsel. *Id.* Under Tennessee Rule of Criminal Procedure 44, the trial court is required, prior to accepting a waiver of the right to counsel, to advise the accused of the right to the assistance of counsel at all stages of the proceedings and to inquire into the background, experience, and conduct of the accused to determine whether waiver is competent and intelligent. Tenn. R. Crim. P. 44(b)(1). The Rule further requires the waiver to be in writing and included in the record. Tenn. R. Crim. P. 44(b)(2), (b)(3).

The State contends that defendant waived the assertion of the right to self-representation because there is no written waiver of the right to counsel in the record. It is apparent from the Rule, however, that the written waiver is required only in the event that the defendant is permitted to proceed pro se. There is no requirement that the *request* for permission to waive the right to counsel and proceed pro se be in writing. *State v. John Allen Hessmer*, No. M2012-01079-CCA-R9-CD, 2013 WL 1249022, at *2 (Tenn. Crim. App. Mar. 28, 2013) (rejecting, on interlocutory appeal, the argument that failure to include a written waiver of the right to counsel waived the claim to self-representation and reversing the trial court's denial of the motion to proceed pro se). Here, the defendant requested to proceed pro se, and his request was summarily denied. He later made another request to either be permitted to change counsel or to proceed pro se. The trial court denied permission to change attorneys and did not rule on the request for self-representation. The defendant was not required to introduce a written waiver of the right to counsel when the trial court had determined that he would not be permitted to

waive the right to counsel. Accordingly, we do not find the lack of a written waiver in the record to be dispositive.

In order to assert the right to self-representation: "(1) a defendant must make the request in a timely manner, (2) the assertion of the right of self-representation must be clear and unequivocal, and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel." *Hester*, 324 S.W.3d at 30-31; *State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988) (reversing the defendant's convictions). Courts have generally "assigned a constitutional primacy to the right to counsel over the right of self-representation." *Hester*, 324 S.W.3d at 30. Accordingly, "[c]ourts should indulge every presumption against waiver of the right to counsel." *Lovin*, 286 S.W.3d at 287 n.15.

In determining whether the defendant is knowingly waiving the right to counsel and exercising the right to self-representation, the defendant's technical legal knowledge is not relevant. *State v. Goodwin*, 909 S.W.2d 35, 40 (Tenn. Crim. App. 1995). The defendant "need not have knowledge of the law and the legal system equal to that of an attorney to knowingly and intelligently waive this right." *Goodwin*, 909 S.W.2d at 40. "'[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself.'" *Hester*, 324 S.W.3d at 31 (quoting *Godinez v. Moran,* 509 U.S. 389, 399 (1993)).

However, the trial court must ensure that the defendant's waiver of the right to counsel is done knowingly. "A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)). In *Smith v. State*, the Tennessee Supreme Court recommended that a trial court ask the questions in the appendix of that opinion. *Smith v. State*, 987 S.W.2d 871, 875 (Tenn. Crim. App. 1998). These questions inform the defendant of the nature of the charges and range of punishment he or she faces, as well as the fact that the defendant will be expected to conform to the Rules of Evidence and Criminal Procedure in trying the case. *Smith*, 987 S.W.2d at 877-78 (appendix). The trial court is advised to warn the defendant that self-representation is unwise. *Id.* "The right to represent oneself … should be granted only after a determination by the trial court that the defendant is both knowingly and intelligently waiving the valuable right to assistance of counsel." *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999).

In July, the trial court denied the defendant's clear and unequivocal request to proceed pro se without giving any reason for doing so. We conclude that this act was in error. When the defendant expressed a desire to defend himself, the trial court was

13

required to determine whether the waiver of the right to counsel was knowing and intelligent. The State does not contend that the July request was equivocal or untimely; the trial court was required to proceed to determine whether the waiver was knowing and intelligent. The trial court could not deny the defendant his right to self-representation based solely on his lack of legal knowledge.

The State essentially asserts that the lack of a written waiver is fatal to the defendant's claim but that, in any event, any error in the first proceeding was cured by the defendant's actions during the second hearing. The State argues that the second hearing on the right to self-representation, at which the defendant requested either to represent himself or to change counsel, was in essence a waiver any error premised on the denial of the right to self-representation. At the hearing, the defendant's attorney summarized for the trial court that the defendant's request for self-representation had previously been raised and denied and that trial counsel was the third attorney to represent the defendant. The bulk of the discussion at this hearing centered around the defendant's allegation that trial counsel did not correctly understand the elements of the offense. In response to the trial court's questioning, the defendant also addressed his ability to hire counsel. The defendant's statements during the hearing were all made in response to the trial court's questions and as part of the conversation regarding the elements of the offense. The trial court questioned the defendant regarding his ability to pay for counsel and the reason that he was dissatisfied with his attorney. The judge never asked the defendant any questions regarding the request for self-representation — a request which the court was informed had already been denied by a different judge. The court did not ask whether the defendant wished to proceed pro se should the court deny the motion to change attorneys, although the defendant's attorney had informed the court that the defendant wanted to again raise his right of self-representation. We do not think waiver can be presumed from the defendant's equivocal second request, particularly when the defendant's previous motion for self-representation had been summarily denied.

Although the State asserts that the defendant waived his right to self-representation by not renewing his motion for self-representation unequivocally but instead asking to be allowed either to hire his own counsel or represent himself, "[d]efendants … are free to seek to invoke a right of self-representation as an alternative should their request for the appointment of a different attorney be denied." *Hester*, 324 S.W.3d at 33 (nevertheless concluding that the fact that the defendant was attempting to manipulate the judicial system and the fact that he did not object to the attorney ultimately assigned to him supported the conclusion that he had waived the right to self-representation). Accordingly, while this second request was equivocal and could not in itself form the basis of a conclusion that the defendant was denied his right to self-representation, neither does it cure the trial court's initial erroneous denial.

14

The right to self-representation is not absolute. *Hester*, 324 S.W.3d at 31. Even where the procedural requirements have been met, the court may deny the right when it appears that the defendant "seeks to abuse the dignity of the courtroom or to engage in serious obstructionist misconduct." *Id.* In *State v. Hester*, the Tennessee Supreme Court concluded that the trial court erred in denying the defendant's motion for self-representation based on its assessment of his legal knowledge and his physical difficulties in communicating. *Id.* at 31, 32. Ultimately, however, the *Hester* Court concluded that there was no constitutional error because the denial of self-representation was also properly supported by the trial court's determination that the request was intended to manipulate the judicial system. *Id.* at 33-34.

The defendant's first request was made four months prior to trial. The trial court did not make any finding that the defendant was obstructing the judicial process when it denied the motion. While the court here, at the second hearing, raised the possibility that the defendant was attempting to change his representation as a delaying tactic, it specifically refrained from finding that the defendant did so. The court broached the possibility that the defendant was attempting to delay trial, then it stated, "I'm not saying you are." Accordingly, the denial in the second hearing cannot be attributable to a finding that the defendant was attempting to delay the proceedings.

We conclude that the trial court, confronted in July with the defendant's timely and unequivocal request to represent himself, erred in summarily denying the request rather than determining whether the attempted waiver of the right to counsel was knowing and voluntary. The defendant's subsequent request to either change attorneys or represent himself did not cure this error. Because the erroneous denial of the right to self-representation is structural constitutional error, we reverse the defendant's conviction and remand for a determination of whether the defendant's waiver of the right to counsel is knowing and voluntary.

## III. Sentencing

The defendant also asserts that the trial court erred in imposing a ten-year sentence and in denying alternative sentencing. We address the defendant's argument in the event of further appellate review. A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. The court will uphold the sentence "so long as it is within the appropriate range and the record

15

demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b).

Here, the trial court considered the appropriate factors in imposing the ten-year sentence. The defendant does not assert that the trial court misapplied the enhancement factors. An appellate court's disagreement with the trial court's weighing of enhancement and mitigating factors is not grounds for reversal. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). Although the circumstances of the defendant's offense were not egregious and although his sentence is nevertheless the maximum within the range, the appellate court may not reverse so long as the sentence is in the appropriate range and in compliance with the purposes and principles of sentencing. We conclude that the trial court considered the appropriate factors, and we are constrained to conclude that its sentence does not constitute an abuse of discretion.

The defendant also objects to the denial of an alternative sentence. This court likewise reviews the denial of an alternative sentence which falls within the appropriate range and reflects that the decision was based on the purposes and principles of sentencing under an abuse of discretion standard, accompanied by a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). "The abuse of discretion standard does not permit an appellate court to substitute its judgment for that of the trial court." *State v. Kyto Sihapanya*, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *2 (Tenn. Apr. 30, 2014).

The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sentencing Comm'n Cmt. Likewise, the defendant bears the burden of establishing that he or she is a suitable candidate for probation. T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

In determining whether incarceration is an appropriate sentence, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

In the absence of evidence to the contrary and excluding defendants committing the most severe offenses and possessing criminal histories evincing a clear disregard for the laws and morals of society or evincing failure of past efforts at rehabilitation, a standard offender convicted of a Class C, D, or E felony should be considered as a favorable candidate for alternative sentencing options. T.C.A. § 40-35-102(5),(6)(A). The statute states that the court "shall consider, but is not bound by" this guideline. T.C.A. § 40-35-102(6)(D).

The trial court in this case denied probation, delving extensively into the defendant's prior criminal history and the defendant's numerous failed opportunities for rehabilitation. The trial court found that the defendant had violated his probation or parole numerous times and that he had poor potential for rehabilitation. The trial court found that confinement protect the interest of society, noting that the defendant had not been involved in further offenses only because he had been in confinement. The trial court found that probation would depreciate the seriousness of the offense and that confinement was an effective deterrent. The trial court's decision rested on numerous statutory grounds, primarily the fact that measures less restrictive than confinement had frequently been unsuccessfully applied to the defendant. *See State v. Kyto Sihapanya*, 2014 WL 2466054, at *3 ("Accordingly, the heightened standard of review that applies to

cases in which the trial court denies probation based on only [the need for deterrence or only on the need to avoid depreciating the seriousness of the offense] is inapplicable in this case."). Under the abuse of discretion standard, the appellate court may not substitute its judgment for that of the trial court. *Id.* at *2. We conclude that even if we would have preferred a different result, the trial court did not abuse its discretion in sentencing the defendant.

## CONCLUSION

Because the defendant's timely and unequivocal motion for self-representation was summarily denied in error, we reverse the defendant's conviction and remand for further proceedings.

_____
JOHN EVERETT WILLIAMS, JUDGE