IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

## STATE OF TENNESSEE v. NATHAN TODD COOKE

**Appeal from the Circuit Court for Van Buren County
No. 2899M    Larry B. Stanley, Jr., Judge**

_____

### No. M2017-01947-CCA-R3-CD

_____

The Defendant, Nathan Todd Cooke, was convicted by a Van Buren County Circuit Court jury of two counts of driving under the influence, a Class A misdemeanor. *See* T.C.A. § 55-10-401 (2017). The trial court merged the convictions and sentenced him to eleven months, twenty-nine days, with ten days to be served in jail and the balance on probation. On appeal, the Defendant contends that the trial court erred in denying his motion to suppress and that the admission of the blood alcohol test result was plain error. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JOHN EVERETT WILLIAMS, P.J., filed a concurring opinion.

Matthew S. Bailey (at trial and on appeal), Spencer, Tennessee; and Brandon S. Griffin (at trial), Sparta, Tennessee, for the appellant, Nathan Todd Cooke.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; Daniel Julian, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to a police officer's encounter with the Defendant on November 8, 2015. The officer observed the Defendant on foot with a motorcycle parked nearby on the side of the road and stopped to determine if the Defendant needed assistance. During the stop, the officer noticed the odor of alcohol. The Defendant performed poorly on field sobriety tests and was arrested. A blood

sample was drawn after the arrest, and testing by the Tennessee Bureau of Investigation (TBI) revealed that the Defendant had a 0.21 gram percent blood alcohol level.

## Motion to Suppress

The Defendant filed a motion to suppress the evidence resulting from the roadside search and seizure. At the hearing on the motion, the trial court viewed a video recording of the encounter between Tennessee Highway Patrol (THP) Sergeant Jimmy Jones and the Defendant. In the recording, Sergeant Jones's car traveled on a four-lane, divided highway with a grass median and came upon a motorcycle parked on the inside shoulder near the yellow line which separated the left shoulder from the roadway. An SUV was stopped on the wider right emergency shoulder. Both the motorcycle's and the SUV's hazard lights were flashing. The Defendant was on foot walking away from the motorcycle as Sergeant Jones approached, and the Defendant waved his hands outward to waist height and immediately lowered them to his side. The Defendant turned to walk toward Sergeant Jones's patrol car. As the Defendant walked toward the car, he took off his sunglasses and placed them on his head. The reflection of blue lights on the roadway can be seen as Sergeant Jones drove near the Defendant. Sergeant Jones approached the motorcycle from behind and passed it on its left, meaning he was closer to the center grass median than the motorcycle. When he drove toward the Defendant, Sergeant Jones was on the left near the median and the Defendant was on the left paved shoulder near the roadway. The SUV can be seen on the right shoulder, backing up toward Sergeant Jones and the Defendant. In a conversation that takes place off camera, Sergeant Jones asked the Defendant if he had been drinking, and the Defendant said he had not. The Defendant's girlfriend told Sergeant Jones, however, that the Defendant had been drinking "a little bit", that she had been following the Defendant, that the Defendant was "fine," and that "it's not that bad." She said they had driven back to get the Defendant's helmet. Although the participants cannot be seen on camera during this conversation, later footage shows Sergeant Jones walking to the left shoulder and the SUV pulling forward, suggesting that the participants had been on the right shoulder near the SUV during the conversation. Sergeant Jones administered field sobriety tests to the Defendant and placed the Defendant under arrest for DUI. The recording reflects that several cars drove past the scene during the relevant events.

Sergeant Jones testified that on the afternoon of November 8, 2015, he was driving to White County. As he traveled through Van Buren County, he rounded the curve and saw the Defendant dismount a motorcycle and begin walking. He acknowledged that this could not be seen in the video recording from his patrol car. Sergeant Jones said that as he finished coming through a curve, he saw the motorcycle "with the flashers on sitting just almost on the yellow line to the inside shoulder." He further explained that this was on the left side of the roadway. Sergeant Jones said a small SUV was parked on the right shoulder beyond the motorcycle. He said that in accord with THP policy regarding

-2-

stopped vehicles, he stopped to offer assistance. He agreed that he had no suspicion of criminal activity initially and said he stopped solely to determine if he could offer assistance. He said he still would have stopped if only one vehicle had been stopped. He said he stopped near the motorcycle because it was closest to him and was in the more dangerous position of the two stopped vehicles. He agreed that, "[a]t some point," he activated his blue lights "[b]ecause of being on the inside left shoulder." He said he parked in front of the motorcycle. He described the road as a divided, four-lane highway with a speed limit of sixty-five miles per hour. He said that other vehicles were using the road at the time.

Sergeant Jones testified that as he stopped, he saw the Defendant walking away from him and the motorcycle. Sergeant Jones said that he went to the left side of the motorcycle and that the Defendant saw him and came back to Sergeant Jones's passenger-side window. Sergeant Jones said the Defendant threw up his hands when he saw Sergeant Jones. Sergeant Jones agreed that he had activated his blue lights by this time. He said he activated the blue lights for the safety of himself and the other individuals present and that he did not seize the Defendant. He said that this use of blue lights was in accord with standard operating procedures, although he acknowledged that he had, on occasion, parked in a "crossover" without using his blue lights.

Sergeant Jones testified that he asked the Defendant if the Defendant was okay and that the Defendant stated his helmet had blown off. Sergeant Jones said he stepped out of his car, walked to the Defendant, and asked the Defendant where he had been. Sergeant Jones said the Defendant stated he had been at Applebee's in McMinnville. Sergeant Jones said he smelled alcohol on the Defendant but was unsure whether he smelled it when seated in the car or when he was standing near the Defendant, although he thought it was after he was outside the car. Sergeant Jones said the Defendant initially denied but later admitted having an alcoholic drink at Applebee's. Sergeant Jones was unable to specify how much time elapsed before he smelled alcohol while he spoke with the Defendant, but he said, "It wasn't long."

Sergeant Jones testified that he learned during the encounter that the Defendant's girlfriend, Rita Faye Lee, was in the SUV. Sergeant Jones said that Ms. Lee owned the motorcycle. He said that he approached Ms. Lee to ascertain "her role in this." He said she stated that she and the Defendant had been at the Eagles Club at Rock Island and that "they were in a domestic [sic] due to him talking to another female." Sergeant Jones said that Ms. Lee had the Defendant's helmet and that she stated she had stopped to pick it up. Sergeant Jones said he was familiar with the Eagles Club and knew they served alcohol.

Sergeant Jones testified that when he smelled alcohol, he began taking more notice of the Defendant's actions. Sergeant Jones said the Defendant was unsteady on his feet,

had slurred speech, was argumentative, had "really red" eyes, and had been involved in a dispute with his girlfriend.

Sergeant Jones acknowledged that The Landing restaurant was "further up on the right" from where the Defendant parked, but when asked if the restaurant was approximately one third of one mile away, he stated he had never measured the distance. When asked about the time of the encounter, Sergeant Jones said that his "tow slip" was written at 4:50 p.m. and that the initial encounter would have been shortly beforehand. He said that nightfall occurred before he left the scene.

After receiving the proof, the trial court denied the motion to suppress. The case proceeded to trial, and the jury convicted the Defendant of two counts of DUI, which the court merged.

**Trial**

Because this court may consider the trial evidence, as well as the evidence presented at the motion to suppress, we will recount the trial evidence that is relevant to the suppression issue. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

Sergeant Jones testified at the trial that the video recording equipment in his patrol car had activated at the same time as his blue lights. He said that when the recording equipment activated, it had the capability of recording what had occurred for the previous thirty seconds. He said he saw a motorcycle with flashing lights, an SUV on the right shoulder, and a person dismount a motorcycle. He acknowledged he could not identify the person he saw dismounting the motorcycle but said he never lost sight of the person and was able to identify the person as the Defendant when Sergeant Jones was closer. Sergeant Jones said he was about 500 yards from the motorcycle when he first saw it. He said he did not turn on his blue lights until he was closer to the motorcycle. He said that when he stopped, he did not know the Defendant was impaired. Sergeant Jones said that, pursuant to THP policy, troopers were not supposed to drive past a stranded motorist except when attending to an emergency.

Sergeant Jones testified that the Defendant did not see Sergeant Jones until he was "almost stopped" and that when the Defendant saw him, the Defendant "threw up his hands" and began walking back toward Sergeant Jones and the motorcycle. Sergeant Jones said he got out of his car and asked the Defendant if he was having mechanical problems and that the Defendant responded he was not. Sergeant Jones said he could smell alcohol on the Defendant and asked the Defendant if he had been drinking, which the Defendant denied but later said someone had spilled alcohol on his jacket "somewhere in the past." Sergeant Jones said that the Defendant stated he had stopped

because his helmet blew off, that the Defendant later stated his cap blew off, and that the Defendant later said he had been fighting with his "wife," who was in the SUV, and that "she threw the cap from her vehicle but his helmet blew off." Sergeant Jones said he saw a woman across the road with a helmet.

Sergeant Jones testified that the motorcycle was parked in a dangerous location inches from the yellow line. He noted that vehicles were parked on both sides of the road and that state law provided for motorists to move over for stopped vehicles.

Sergeant Jones testified that he suspected the Defendant was heavily intoxicated and that he administered field sobriety tests, during which the Defendant performed poorly.

Ms. Lee testified that she and the Defendant had followed another couple from the Eagles Club, although the other couple was no longer with her and the Defendant when they were stopped on the side of the road. She said she and the Defendant had been stopped for a while before Sergeant Jones arrived. She said initially that the Defendant had not been driving the motorcycle after leaving the Eagles Club, but she later acknowledged that he had.

Mike Smith testified that he had been at the Eagles Club and had offered to drive the motorcycle for the Defendant because the Defendant had been drinking. He said that the motorcycle ran out of gas or had mechanical problems along the way and that he told Ms. Lee and the Defendant he would return later with a trailer to transport the motorcycle. He said he later learned that the Defendant had been arrested for DUI.

# I

## Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress. He argues that Sergeant Jones unlawfully seized the Defendant and that the community caretaking function does not apply. The State counters that the trial court properly denied the motion to suppress because no seizure occurred, but that if a seizure had occurred, Sergeant Jones's actions were a proper exercise of the community caretaking function or were based upon reasonable suspicion. We conclude that the trial court did not err in denying the motion.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and

resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629; *see Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Three levels of police-citizen interactions exist: (1) a full-scale arrest, which requires probable cause, (2) a brief investigatory detention, which requires reasonable suspicion of wrongdoing, and (3) a brief police-citizen encounter, which does not require objective justification. *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). Only the first two categories constitute a "seizure" for purposes of the Constitution. *Id.*

Within the context of warrantless searches and seizures, the courts have recognized certain exceptions to the warrant requirement. *See, e.g.*, *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (listing some of the commonly recognized exceptions to the warrant requirement). The State has the burden to demonstrate that a warrantless search falls within an exception to the warrant requirement. *Id.*

One exception to the warrant requirement is pursuant to the community caretaking doctrine, whereby police officers may, separate from any duties related to the detection or investigation of criminal activity or collection of evidence related to criminal activity, engage in activities that are in furtherance of the general safety and welfare of citizens who may be in peril or otherwise in need of assistance. *State v. McCormick*, 494 S.W.3d 673, 680-83 (Tenn. 2016); *see Cady v. Dombrowski*, 413 U.S. 433 (1973). Thereby, a warrantless seizure is justified if the State establishes the following:

> (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential

threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

*McCormick*, 494 S.W.3d at 687 (quoting *State v. Moats*, 403 S.W.3d 170, 195 (2013) (Clark and Koch, JJ., dissenting)). "'Determining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case[,]' including 'the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance.'" *Id.* (quoting *Moats*, 403 S.W.3d at 195-96 (Clark and Koch, JJ., dissenting)).

In denying the motion to suppress, the trial court stated:

It has always been my opinion in cases like this it comes down to common sense, what we expect out of law enforcement officers on a daily basis. Community caretaking, making sure people are okay if it looks like there is something wrong and that's something we want them to do.

Defense counsel is right. At some point some times those caretaking functions then become a seizure or a stop or someone loses the ability to carry on in their activities and so we have to dissect when one transfers to the other.

In this case it's clear I think everybody acknowledges that the State Trooper came around a corner, had a pretty good distance of a few hundred yards and could see and it's clear that anyone can see in the video that there was a motorcycle parked on the left-hand shoulder of the highway and the officer, the trooper testified that it was close to the yellow line, a foot or two from the yellow line. It was not dark. It was getting what I would call dusky. It was overcast. You could see that. The motorcycle is close to the yellow left line and he's got his flashing lights on. So I think any officer – I think it would be almost derelict in their duty if they did not attempt to see what is going on to make sure that the motorist is not sick or needs assistance or whatever the situation is, broken down.

So I think at that point the officer absolutely has the right to pull over and see what is going on. So the question then we ask is okay what lights do you turn on and when and that's very discretionary. I think it's common place for State Troopers along with other officers if you are on a highway and this is the description that the highway was, it can be busy but it was not particularly busy that day, there were cars coming and going but

-7-

not especially heavy, so the officer has to decide what lights and when to turn them on. He turns his blue lights on as he is approaching what defense counsel refers to as the turnaround. It's just a paved section in between the eastbound and westbound lanes of the highway. The officer turns the lights on just before he gets to that and pulls up to the left of the motorcycle and goes around him as the defendant is beginning to walk back towards him. I did not see that the officer blocked the motorcycle or blocked the defendant and there was no testimony about telling the defendant that he was seized or not free to leave. We have to ask the question what would a reasonable person feel, were they free to go? I know it's conflicting. In the one sense the officer said nothing to the defendant about that he is not free to continue back towards his motorcycle and continue on. On the other hand the blue lights are on and to some people that means they are seized.

It is my opinion in this situation that the officer turned his lights on as a caution to other motorists to protect the defendant and himself. Now the other vehicle on the right side of the road I don't really know how that plays into the stop. What I saw was that there was a vehicle with their lights on on the right side of the road, I think flashing lights, I'm not sure but anyway, they were backing up down the right median or off the right shoulder backing up to where the officer was. So he did have two vehicles in the vicinity and you know, the question is it okay to turn the blue lights on for your protection and the protection of others? I think so. Is there a distinction between what the defense counsel refers to as amber lights and blue lights? I don't know that. There was no discussion about what lights a trooper has available to them. They obviously have blue lights and flashing lights. He may have additional lights. There may be a requirement that in a non-situation where someone is not stopped and not free – or where they are free to leave that you are just going to check on someone there may be some indication from the Supreme Court that maybe they should turn on some other colored lights. But in this situation he turned on what I – what he testified he had was blue lights and turned those on. I feel like that's very reasonable in this situation to protect himself and to protect the gentleman who is off of a motorcycle[,] close to the highway where traffic does travel the same direction and they were closest to the fast moving lane, what would be the left lane.

I think if the officer, if the Trooper had said, hey, get in the car or hey, stop, you know, I need to ask you some questions but I think it's perfectly fine for him to say, hey, are you okay? Do you need some assistance? Is your vehicle functioning? We want them to do that and in this circumstance I think he did that and it was perfectly acceptable because

I don't think a reasonable person – if the defendant in this situation said, no, I'm good, I just thought I saw something on the side of the road and was checking it out but I'm good and got on his motorcycle and left, I don't think the trooper has got any reason that he can keep him there but when the defendant voluntarily talked to the officer when he just said, hey, are you okay? Do you need some assistance? Then the officer smelled alcohol, you know, I think that's okay.

. . . The defendant was not seized. I think a reasonable person would have felt free to leave unless there was some other indication and I think the officer had the right to turn the lights on for everyone's safety in that situation.

Because the evidence shows that Sergeant Jones activated his blue lights before engaging the Defendant, we will begin our analysis with the question of whether Sergeant Jones seized the Defendant by activating the patrol car's blue lights or by other show of authority. The question of when a seizure occurs is one which is not readily answered by existing caselaw. In *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), the Supreme Court said that a person is "seized" for Fourth Amendment purposes when, in view of the totality of the circumstances, a reasonable person would think he was not free to leave. Later, in *California v. Hodari D.*, 499 U.S. 621, 626 (1991), the Supreme Court limited *Mendenhall* and said that a seizure occurs when an officer uses physical force against a suspect or the suspect submits to a show of authority by the officer. Despite the Supreme Court's *Hodari D.* decision, Tennessee courts continued to utilize the *Mendenhall* totality of the circumstances approach. *See, e.g.*, *State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000); *State v. Gonzalez*, 52 S.W.3d 90, 95-96 (Tenn. Crim. App. 2000). In *State v. Randolph*, 74 S.W.3d 330, 337 (Tenn. 2002), the supreme court approved the *Mendenhall* standard and stated that it joined the jurisdictions which had rejected *Hodari D.* The *Randolph* court stated that its own precedent, as well as Tennessee Constitution, article I, section 7, required its rejection of *Hodari D. Randolph*, 74 S.W.3d at 337. In 2016, the supreme court noted *Randolph*'s adherence to *Mendenhall* and said it had "implicitly rejected" *Hodari D.*, notwithstanding fairly direct language in *Randolph* rejecting *Hodari D. See McCormick*, 494 S.W.3d at 680; *Randolph*, 74 S.W.3d at 337. In any event, the *McCormick* court noted its previous reliance on the *Mendenhall* standard, whereby a person is "seized" for Fourth Amendment purposes when, in view of the totality of the circumstances, a reasonable person would think he was not free to leave, and the court declined the State's invitation to revisit the question of whether Tennessee should utilize the *Hodari D.* standard on the basis that the protections of article I, section 7 were coextensive with those of the Fourth Amendment. *See McCormick*, 494 S.W.3d at 680. The *McCormick* court declined to reach the issue by presuming, for purposes of adjudicating the appeal, that a seizure had occurred and by addressing the question of whether the community caretaking exception applied. *See id.* Since the *McCormick*

decision, the supreme court has not abandoned the *Mendenhall* approach and adopted the *Hodari D.* standard. We will, therefore, adhere to the *Mendenhall* standard, as followed in *Randolph*. *Cf. State v. Hawkins*, 519 S.W.3d 1, 33 n.9 (Tenn. 2017) (factually distinguishing *Hodari D.* and *Randolph* from the case at bar but stating that the *Mendenhall* standard controlled).

Generally, a seizure results from an officer's activation of his blue lights during an encounter with a citizen. *See State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993). In some cases, however, an officer may activate his blue lights without effecting a seizure, such as out of safety concerns. *See State v. Williams*, 185 S.W.3d 311, 318 (Tenn. 2006) (acknowledging that not every use of blue lights amounts to a show of authority resulting in a seizure and that officers engaged in community caretaking may use blue lights for the safety of themselves and citizens), *abrogated in part by State v. McCormick*, 494 S.W.3d 673 (Tenn. 2016). In the present case, Officer Jones saw the Defendant dismount the motorcycle and begin walking. Officer Jones approached and passed the motorcycle, driving near the grassy median and on the left side of the motorcycle. The Defendant was on the shoulder between Officer Jones, who was closer to the median, and the roadway. At some point before he began speaking to the Defendant, Officer Jones activated his patrol car's blue lights.

The trial court concluded that no seizure occurred when Officer Jones approached the Defendant with activated blue lights, and the record supports the court's determination. Officer Jones came upon two stopped vehicles with flashing hazard lights and a person on foot on a divided, four-lane highway. Officer Jones did not cause the Defendant to stop the motorcycle, as in a routine traffic stop. Rather, Officer Jones drove beside the Defendant, who was on foot. Officer Jones approached the Defendant in a way that did not block the Defendant from returning to the motorcycle, walking to the SUV, or continuing to walk on the shoulder. Officer Jones activated his patrol car's blue lights for safety reasons, given the presence of two stopped vehicles on opposite shoulders of the roadway and a pedestrian. When Officer Jones initially approached the Defendant, he did not tell the Defendant that he was not free to leave. Rather, Officer Jones asked if the Defendant needed help, and they discussed the helmet or hat as the reason the Defendant had parked and was off of the motorcycle. This was a brief police-citizen encounter, for which legal justification was not required. *See Day*, 263 S.W.3d at 901. Although the Defendant argues that Officer Jones might have taken other actions, such as activating amber lights rather than blue lights and parking on a turnaround rather than pulling beside the Defendant, the proper focus is upon whether, in view of the totality of the circumstances, a reasonable person would think he was not free to leave. *See McCormick*, 494 S.W.3d at 680.

During that encounter, Officer Jones observed the Defendant and smelled alcohol, giving Officer Jones reasonable suspicion that the Defendant was impaired and had

driven under the influence, which justified Officer Jones's detention of the Defendant for further investigation. *See id.* Upon further interaction with the Defendant, during which the Defendant offered inconsistent versions of the evening's earlier events and during which the Defendant performed poorly on field sobriety tests, Officer Jones developed probable cause for the arrest of the Defendant for DUI. *See id.* We conclude that the trial court did not err in denying the motion to suppress.

Even if we were to view Officer Jones's approach of the Defendant with activated blue lights as a show of authority, suppression of the evidence related to the stop was not warranted because Officer Jones's actions may be viewed as a proper exercise of the community caretaking function. Officer Jones saw two vehicles with flashing hazard lights on opposite shoulders, and he saw the Defendant walking on the inner shoulder. In these circumstances, a reasonable officer could conclude that a community caretaking action was needed to determine whether the Defendant needed assistance and because the motorcycle was parked in a dangerous location near the yellow line which separated the shoulder from the roadway. *See McCormick*, 494 S.W.3d at 687. Officer Jones spoke to the Defendant briefly about whether the Defendant needed assistance and without verbally or physically detaining the Defendant. Thus, Officer Jones's actions "were reasonably restrained and were tailored to the need for community caretaking." *See id.*

The trial court did not err in denying the motion to suppress, and the Defendant is not entitled to relief on this basis.

## II

## Admission of Blood Alcohol Test Results

The Defendant contends that the trial court erred because it did not, sua sponte, suppress the results of the Defendant's blood-alcohol test because his due process rights were violated by the TBI's collection of a fee for each DUI conviction obtained in which a TBI laboratory test result was used as evidence. The Defendant asks this court to take notice of the issue as a matter of plain error. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). As authority for his due process argument, the Defendant relies upon *State v. Rosemary L. Decosimo*, No. E2017-00696-CCA-R3-CD, 2018 WL 733218 (Tenn. Crim. App. Feb. 6, 2018). Unfortunately for the Defendant, after he filed his brief, the supreme court reversed this court's *Rosemary L. Decosimo* decision. *See State v. Decosimo*, 555 S.W.3d 494 (Tenn. 2018). The Defendant is not entitled to plain error relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE